**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| Frederick "Guy" Berndt, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No. 6:08-cv-1067** |
| | ) | |
| Robert A. Levy, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

**PLAINTIFF'S RESPONSE TO**
**DEFENDANT ROBERT A. LEVY'S MOTION AND**
**MEMORANDUM FOR PARTIAL SUMMARY JUDGMENT**

COMES NOW the Plaintiff, Frederick "Guy" Berndt, and offers the following Response

in Opposition to Defendant Robert A. Levy's (hereinafter referred to as Defendant Levy) Motion

for Partial Summary Judgment:

I.     <u>**PLAINTIFF'S RESPONSE TO DEFENDANT LEVY'S STATEMENT OF FACTS**</u>:

Plaintiff offers the following response to Defendant Levy's Statements of Uncontroverted

Facts, while reserving the right to challenge these facts if the controversy proceeds to trial

against Defendant Levy.

**Fact No. 1**:     *Plaintiff was injured on June 9, 2000, in an accident at the Stanton County, Kansas landfill. (Frederick Berndt Dep., Medical Malpractice case, 44:19-22, 45:5-12, 46:25-48:22, Exhibit A).*

     <u>**Plaintiff's Response**</u>: Not controverted.

**Fact No. 2**:      *Among other injuries, Plaintiff sustained a severe calcaneous fracture in that accident, which required medical attention. (F. Berndt dep., medical malpractice case, 46:25-48:22, Exhibit A).*

      <u>**Plaintiff's Response**</u>: Controverted as to the term that Plaintiff sustained a "severe" calcaneous fracture.  The severity of Plaintiff's injury requires expert testimony. (F.R.E. § 702-703).

**Fact No. 3**:      *After being taken to the Emergency Room at Stanton County Hospital, Plaintiff was transferred to St. Catherine's Hospital in Garden City, Kansas.  (Id. at 52:15-53:3-24, 60-12-61:2, Exhibit A).*

      <u>**Plaintiff's Response**</u>: Not controverted.

**Fact No. 4**:      *Once at St. Catherine's Hospital, Plaintiff came under the care and treatment of Dr. Gary Kramer, an orthopedic surgeon. (Id. at 68:9-13, Exhibit A).*

      <u>**Plaintiff's Response**</u>: Not controverted.

**Fact No. 5**:      *Plaintiff underwent a surgical repair of the fractured calcaneous by Dr. Kramer on June 14, 2000. (Id, at 75:1-6, Exhibit A).*

      <u>**Plaintiff's Response**</u>: Not controverted.

**Fact No. 6**:      *From that time to present, Plaintiff has continued to undergo medical treatment for injuries that originated from the June 9, 2000 accident. (J. Berndt dep., instant case, 82:18-83:10, Exhibit B; F. Berndt Dep., instant case, 83:10-83:22; 88:1-88:21, 183:5-184:15, Exhibit C).*

      <u>**Plaintiff's Response**</u>: Not controverted.

**Fact No. 7**:     *On or about March 11, 2002, Plaintiff retained Defendant to represent him in, among other things, a workers compensation case arising out of the June 9, 2000 injury.  (Workers' Compensation Contract for Employment of Attorney, Exhibit D).*

**Plaintiff's Response**: Controverted.  Defendant Levy was retained by Plaintiff Berndt. According to a memo generated by Defendant Levy's office, Mr. Berndt's wife first contacted Defendant Levy's office the first week of September 2001.  Thereafter, on September 11, 2001, Mrs. Berndt again called Defendant Levy's office and an intra-office memo was generated concerning the phone call. The memo documents that Mr. Berndt "got staff like infection and ultimately lost his leg"; and "also had ear damage from medication he was on".   (Exhibit 1; September 11, 2001 Memo).  Sometime after September 11, 2001, Defendant  Levy made hand written notations on a copy of the September 11, 2001 Memo, but he does not remember when he made the notations or if he made the notations during a phone conversation or during an in-person meeting. (Exhibit 1; September 11, 2001 Memo with handwritten notations; Exhibit 2; R. Levy Deposition; pg. 55:2-10).

Thereafter, on September 14, 2001, Defendant Levy provided legal services to Plaintiff Berndt when he telephoned a medical provider, Ed Gormanson at Hanger Prosthetics, concerning Mr. Berndt's prosthetic care and treatment.  (Exhibit 3; Medical Record, #001447; Exhibit 4; Gormanson Deposition; pg. 32:10 to pg. 33:22).

**Fact No. 8**:     *In conjunction with that case, Plaintiff received workers compensation benefits for lost wages and medical expenses from Employers Mutual Insurance Company and Stanton County, Kansas, which covered Plaintiff's medical care for all injuries arising out of the June 9, 2000 injury, including the amputation and prosthetic device. (Award on Joint Petition and Stipulation, Exhibit E; F. Berndt Dep., instant case, 118:7 - 118:25, Exhibit C).*

**Plaintiff's Response**: Admit that Claimant received worker's compensation benefits for partial wage loss and medical benefits.  Controverted, as worker's compensation benefits are a collateral source under Kansas Law.  Therefore, this statement of fact is irrelevant, and not admissible at the time of trial.

**Fact No. 9**:     *The worker's compensation case was eventually settled, but the award for medical expenses was left "open" so that Plaintiff could continue to receive medical care through the workers compensation carrier for his injuries. (Award on Joint Petition and Stipulation, Exhibit E; F. Berndt Dep., instant case, 173:3-176:6, Exhibit C).*

**Plaintiff's Response**: Admit that medical expenses were left open.  Controverted, as worker's compensation benefits are a collateral source under Kansas Law. Therefore, this statement of fact is irrelevant, and not admissible at the time of trial.

**Fact No. 10**:    *Defendant also represented Plaintiff in the medical malpractice case against Dr. Gary Kramer, and filed a cause of action on Plaintiff's behalf in said case. (Contingency Fee Agreement, Exhibit F; R. Levy Dep. 143:5-23, Exhibit G; Berndt v. Kramer Docket Sheet, p.3, Exhibit H).*

**Plaintiff's Response**: Controverted as to being non-specific.  On October 24, 2002, Robert Levy filed a Request to Convene a Medical Malpractice Screening Panel in Finney County, Kansas on behalf of Mr. Berndt against Dr. Gary Kramer and the Garden Medical Clinic. (Exhibit 5; Defendant's Response to Plaintiff's First Request for Admissions; No. 17).   The screening panel was dismissed on July 28, 2003, without ever convening.  (Exhibit 6; MMSP Dismissal).  On August 5, 2003, Robert Levy filed a civil action in the United States District Court, District of Kansas, on behalf of Mr. Berndt against Dr. Gary Kramer (Case No. 03-1283-JTM).  (Exhibit 5; Defendant's Response to Plaintiff's First Request for Admissions; No. 19).

Defendant Levy first provided legal services to Plaintiff Berndt in September 2001.  (See Plaintiff's Response to Statement of Fact No. 7, supra.)

**Fact No. 11:**    *Employers Mutual Insurance Company and Stanton County, Kansas intervened in the medical malpractice suit in order to protect their subrogation interest in the case. (Notice of Subrogation Claim, Exhibit I).*

**Plaintiff's Response**: Plaintiff admits that Employers Mutual Insurance Company and Stanton County's Motion to Intervene was granted on January 5, 2004 in the District of Kansas Case Number 03-1283, JTM. (Dkt No. 13).  No court determination was ever made whether the lien was valid and enforceable. (Exhibit 7; Dkt in Case No. 03-1283). Controverted as being irrelevant and not admissible as the fact of the subrogation lien is irrelevant and not admissible at the time of trial under the Kansas Collateral Source Rule.

**Fact No. 12**:    *Pursuant to their intervention, Employers Mutual Insurance Company and Stanton County, Kansas had a subrogation interest in their specific lien of*

4

*$258,633.43 (with $178,831.99 in medical benefits), as well as any non-duplicative amounts and additional benefits to be paid by them in the future. (Award on Joint Petition and Stipulation, Exhibit E).*

**Plaintiff's Response**: Admit that Employers Mutual asserted a subrogation interest. Controverted that the lien was valid as it had no force and effect when the medical malpractice case was dismissed on Statute of Limitations grounds. Controverted that Employers Mutual Insurance Company "had" a subrogation interest. Controverted as to the amount of Employers Mutual Insurance Company and Stanton County, Kansas' subrogation lien and whether such lien was valid and enforceable. (Exhibit 7; Dkt in Case No. 03-1283). Also, controverted as Worker's Compensation benefits are a collateral source under Kansas Law. Therefore, this statement of fact is irrelevant, and not admissible at the time of trial.

**Fact No. 13**:  *The United States District Court for the District Of Kansas entered summary judgment against Plaintiff in the medical malpractice case and found that it was not filed within the applicable statute of limitations. (Berndt v. Kramer, Docket Sheet, P. 10, 11, Exhibit H).*

**Plaintiff's Response**: Not controverted that on December 24, 2004, Judge Marten entered summary judgment on Defendant Kramer's behalf in District of Kansas Case No. 03- 1283-JTM, holding that Mr. Berndt's case was not filed within the Statute of Limitations, finding that the Statute of Limitations expired on September 1, 2002. (Dkt No. 53, Case no. 03-1283-JTM).

**Fact No. 14**:  *The Tenth Circuit affirmed that decision. (Plaintiff's Complaint ¶ 15, Exhibit J).*

**Plaintiff's Response**: Admit with the clarification that on September 18, 2007, the Tenth Circuit Court of Appeals ruled that on September 1, 2000, Plaintiff Berndt's injury was "reasonably ascertainable", and Plaintiff had reason to know his injury was permanent. Therefore, the Court ruled the Statute of Limitations began to run on September 1, 2000. Mr. Berndt's claims against Dr. Kramer for his right leg amputation were found to be barred by the Statute of Limitations because Robert Levy did not file an action until October 24, 2002. In addition, the Tenth Circuit's decision specifically stated: "This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1." *(Berndt v. Kramer*, 249 Fed. Appx. 45, C.A. 10 (Kan. 2007).

**Fact No. 15:**   *Plaintiff subsequently filed the instant case against Defendant alleging Defendant was negligent in failing to file the underlying medical malpractice case within the statute of limitations.  (Plaintiff's Complaint, Exhibit J).*

**Plaintiff's Response**: Controverted.  In addition to filing the case outside of the Statute of Limitations date, Plaintiff also alleges that Defendant Levy was otherwise negligent in the investigation, management and handling of Plaintiff's medical malpractice action against Gary M. Kramer, M.D.  (Dkt No. 1, Plaintiff's Complaint, ¶16-20).

**Fact No. 16:**   *In the instant case Plaintiff seeks damages that he alleges he would have recovered in the medical malpractice action had it been timely filed and permitted to proceed to a final result.  (Plaintiff's Complaint, Exhibit J).*

**Plaintiff's Response**: Controverted.  Plaintiff is seeking damages he alleges he would have recovered in the medical malpractice action had it been timely filed and properly handled and managed; and controvert that these are the only damages Plaintiff is seeking. Plaintiff is also seeking consequential damages incurred as a result of having to file his legal malpractice case against Defendant Levy. (Dkt No. 85; Plaintiff's Second Supplemental Rule 26 Disclosures).

**Fact No. 17:**   *Among other damages, Plaintiff seeks damages for past and future wages and medical expenses.  (Plaintiff's Rule 26 Disclosures, Part C., p. 6, Exhibit K).*

**Plaintiff's Response**: Not controverted, but Plaintiff clarifies that he is seeking damages for past and future lost of wages; past and future medical and rehabilitation expenses; both past and future, pain, suffering, disability, loss of enjoyment of life; lost household services, past and future; loss of consortium, past and future; and added legal expenses incurred by Plaintiff by virtue of having to file his legal malpractice action.
(Dkt No. 85; Plaintiff's Second Supplemental Rule 26 Disclosures).

## PLAINTIFF'S ADDITIONAL STATEMENTS OF UNCONTROVERTED FACTS:

Pursuant to D. Kan R. 56.1 (a), Plaintiff submits the following additional statements of

uncontroverted facts in response to Defendant Levy's Motion for Partial Summary Judgment:

**PLAINTIFF'S UNCONTROVERTED FACT 1:**

In Defendant Levy's answer, Defendant Levy admitted the existence of an attorney client relationship between Plaintiff Berndt and Defendant Levy at all material times. (Dkt. No. 2; Defendant's Answer, ¶ 4).

**PLAINTIFF'S UNCONTROVERTED FACT 2:**

Steve Brave was one of the attorneys representing Dr. Gary Kramer in the medical malpractice action.  (Exhibit 8; Brave Deposition; pg. 5:16-23).  Steve Brave was deposed on December 18, 2008.  (Exhibit 8; Brave Deposition).

A.    In Mr. Brave's deposition, he testified that, but for Robert Levy's failure to timely file Mr. Berndt's action against Dr. Gary Kramer, the medical malpractice action against Dr. Kramer was so strong that Dr. Kramer likely would have admitted that he departed from the applicable standard of care in his care and treatment of Plaintiff Berndt. (Exhibit 8; Brave Deposition; pg. 84:12 to 85:12).

B.    Mr. Brave has further testified that he believes that Dr. Kramer practiced at the Garden Medical Clinic in Garden City, Kansas from January 1996 though July 2002.  After this, Dr. Kramer relocated to Muskogee, Oklahoma and continued to practice as a full-time orthopedic surgeon.  Mr. Brave is not aware of Dr. Kramer ever filing bankruptcy and to the best of his knowledge, Dr. Kramer was financially stable.  Mr. Brave testified that had the *Berndt v. Kramer* case been tried to a jury and resulted in a verdict in excess of Dr. Kramer's applicable insurance limits, he is not aware of any circumstances that would have prohibited Dr. Kramer from personally paying any such excess judgment. (Exhibit 9; Brave Affidavit).

**PLAINTIFF'S UNCONTROVERTED FACT 3:**

Jerry Levy has been a Plaintiff's attorney in cases involving Dr. Gary Kramer on at least four occasions.  (Exhibit 11; Jerry Levy Affidavit ¶ 2).

7

A. Mr. Jerry Levy believes that during the time Dr. Kramer practiced in Garden City, Kansas, he always had a busy orthopedic practice; Dr. Kramer's CV states that he had 5,000 patient encounters per year and did between 500 and 600 surgical procedures. (Exhibit 12; Kramer CV and Exhibit 11; Jerry Levy Affidavit, ¶ 6).

B. Mr. Jerry Levy does not believe Dr. Kramer ever filed bankruptcy, or had any financial difficulties. (Exhibit 11; Jerry Levy Affidavit, ¶ 8).

C. Had Defendant Robert Levy timely filed the *Berndt v. Kramer* medical malpractice case, and the case gone to a jury trial in January, 2005, Jerry Levy believes any excess judgment, even to the amount of Plaintiff's prayer requested in the Pretrial Order of Two Million Four Hundred Seventy-Nine Thousand Dollars ($2,479,000.00), would have been collected from Dr. Kramer. (Exhibit 11; Jerry Levy Affidavit, ¶ 9).

**PLAINTIFF'S UNCONTROVERTED FACT 4**:

The Pretrial Order entered in the Medical Malpractice action, Case No. 03-1283-JTM, seeks total damages of $2,479,000.00.  The Pretrial Order indicates the case was to be tried to a jury beginning on January 19, 2005. (Dkt. #43; Case No. 03-1283 JTM).

**PLAINTIFF'S UNCONTROVERTED FACT 5:**

Plaintiff's damages sustained as a result of Dr. Kramer's negligence far exceed $800,000.00.   Plaintiff's future medical and rehabilitation expenses are between $499,261.18 and $863,816.47. (Exhibit 13; Sherry Latham Life Care Plan Summary).  Plaintiff's past and future wage loss equals approximately $538,473.00 (Exhibit 14; Gary Baker Economic Report). Plaintiff's loss of past and future household services are $85,493.00. (Exhibit 14; Gary Baker Economic Report).  Past medical expenses are about $200,000.00. (Exhibit 15; Medical Expense Summary).  In addition, Plaintiff has sustained non-economic damages for pain, suffering, loss

8

of enjoyment of life and loss of consortium.   Finally, Plaintiff has incurred consequential damages for added legal expenses in pursuing his legal malpractice claim against Defendant Levy.

**PLAINTIFF'S UNCONTROVERTED FACT  6**:

In his deposition taken in the *Berndt v. Kramer* Medical Malpractice action on March 24, 2004, Dr. Kramer testified as follows:

    a.      He has a degree in biomechanic engineering. (Exhibit 16; Kramer Deposition; pg. 7:6-12)

    b.      He attended Rush University School of Medicine in Chicago from 1980 - 1985. (Exhibit 16; Kramer Deposition; pg. 7:24 to 8:13).

    c.      Dr. Kramer took a residency in orthopedic surgery at St. Luke's Medical Center from 1985 - 1990. (Exhibit 16; Kramer Deposition; pg. 9:5-14).

    d.      Dr. Kramer worked as an orthopaedic surgeon for one year in Independence, Missouri. (Exhibit 16; Kramer Deposition; pg. 10:1-4).

    e.      Dr. Kramer worked as an orthopaedic surgeon for 5 - 6 years at Kanza Multi-Specialty Group in Kansas City, Kansas. (Exhibit 16; Kramer Deposition; pg. 10: 22 to 11:12).

    f.      In 1996, Dr. Kramer relocated to Garden City, Kansas at the Garden Medical Clinic; leaving in 2002. (Exhibit 16; Kramer Deposition; pg. 12:7 to 13: 4).

    g.      In 2002, Dr. Kramer began a practice in Muskogee, Oklahoma with Dr. Fred Ruefer and Dr. Guy Grooms. (Exhibit 16; Kramer Deposition; pg. 15:7:14).

    h.      As of March 24, 2004, Dr. Kramer had practiced full time, twenty-two months, in Muskogee Oklahoma, except for several weeks in the summer of 2003 and a month in December 2003. (Exhibit 16; Kramer Deposition; pg. 23:11 to 24:8).

    i.      Since completing medical school, Dr. Kramer always worked as a general orthopedic surgeon. (Exhibit 16; Kramer Deposition; pg. 27:15-18).

**PLAINTIFF'S UNCONTROVERTED FACT  7:**

Dr. Gary Kramer's CV, dated March 26, 2001 states his educational background and work experience, and affiliations with national and state medical organizations.  In his CV, Dr. Kramer lists his current work experience: "January 1996 to present, Employed as an Orthopedic Surgeon for Garden Medical Clinic, P.A.  Current production is 5000 patient encounters and 500 - 700 surgical cases/year, not including fracture treatments in the office.  General Orthopedic practice caring for everything but instrumented spine surgery, necks and microsurgery of the hand."  (Exhibit 12; Kramer's CV)

**PLAINTIFF'S UNCONTROVERTED FACT  8:**

In the medical malpractice action (Case no. 03-1283-JTM), Dr. Kramer responded to Plaintiff Berndt's Interrogatory Number 7 by stating he had insurance coverage through the Health Care Stabilization Fund for $800,000.00.  (Exhibit 17; Kramer Responses to First Set of Interrogatories, No. 7).  Dr. Kramer responded to Interrogatory 12 by stating when he relocated to Oklahoma he obtained insurance coverage from PLICO (Physicians Liability Insurance Company).  (Exhibit 17; Kramer Responses to First Set of Interrogatories, No. 12)

    a.      Dr. Kramer's PLICO Insurance records indicate that from 2002 through 2004 Dr. Kramer had three million dollars in PLICO insurance coverage and in 2005 he had 2 million in insurance coverage. (Exhibit 18).

**PLAINTIFF'S UNCONTROVERTED FACT 9:**

Dr. Kramer died on February 3, 2008.  (Exhibit 19; Social Security Death Record and Exhibit 20; Gary Kramer Obituary).

**PLAINTIFF'S UNCONTROVERTED FACT 10:**

A PACER search of the Bankruptcy records for Kansas, Oklahoma, Missouri, Ohio and Illinois indicates that Gary M. Kramer (married to Besty Kramer) never filed bankruptcy in any of these states.[1]  (Exhibit 21; PACER Documentation).  According to Dr. Kramer's deposition testimony, these are the only states where Dr. Kramer resided.  (Exhibit 16; Kramer Deposition; pg. 7-13).

**PLAINTIFF'S UNCONTROVERTED FACT 11:**

The United States Bureau of Labor Statistics publishes wage estimates based upon data collected from employers in the industry in metropolitan and non-metropolitan areas in every State and the District of Columbia.  The Kansas Wage Survey for 2002 lists the mean annual salary for all surgeons combined at $196,640.00.   While the state does not have a listing for experienced orthopedic surgeons, an experienced orthopedic surgeon's average salary would certainly not be any less than the mean salary for all physicians combined. (Exhibit 23; 2002 through 2008 U.S. Bureau of Labor Statistics, Survey charts for Health Practitioners and

---

[1] There is a Missouri Bankruptcy listing for a Gary Kramer.  However, the Gary Kramer listed has an address of St. Louis, Missouri and Dr. Kramer never resided in St. Louis, Missouri.

Technical Occupations).

**PLAINTIFF'S UNCONTROVERTED FACT 12:**

The Oklahoma Wage Surveys for 2002 through 2005 lists the mean annual salary for a surgeon at $209,090.00;  $208,910.00; $197,930.00; and $194,520.00.  This includes surgeons with no experience and surgeons with experience; and this category includes general surgeons as well as orthopedic surgeons.  The Wage Survey for the City of Oklahoma City, where Dr. Kramer practiced, lists the annual salaries for surgeons for 2003 and 2004 at: $208,510.00 and $209,040.00.  (Exhibit 23; 2002 through 2008 U.S. Bureau of Labor Statistics, Survey Charts for Health Practitioners and Technical Occupations).

**PLAINTIFF'S UNCONTROVERTED FACT 13:**

The United States Bureau of Labor also issues a National Wage Survey.  In May 2005, the survey closest to when this case would have been tried, but for Defendant Levy's negligence, the mean annual salary for all surgeons combined was $177,690.00.  This includes general surgeons and orthopedic surgeons; as well as hospital based surgeons, university based surgeons and office based surgeons.  For "office-based surgeons, like Dr. Kramer was in 2005, the mean annual salary was $184,350.00.  (Exhibit 22; 2002 through 2008 U.S. Bureau of Labor Statistics, Survey charts for Health Practitioners and Technical Occupations).

# NATURE OF CASE AND SUMMARY OF PLAINTIFF'S RESPONSE

## CASE SUMMARY:

This is a legal malpractice action brought by Plaintiff, Frederick "Guy" Berndt arising out of Defendant Robert A. Levy's failure to timely file Plaintiff Berndt's medical malpractice claims against Dr. Gary Kramer within the statute of limitations. Plaintiff alleges that Defendant Levy failed to properly review, investigate and otherwise manage his case which resulted in defendant Levy's failure to timely file an action against Dr. Gary Kramer. The Tenth Circuit Court of Appeals held the Statute of Limitations on Plaintiff's claims against Dr. Kramer relating to his infection and right leg amputation ran on September 1, 2002. Defendant Levy did not file a Medical Malpractice Screening Panel until October 24, 2002. Thereafter, this legal malpractice case was filed against Robert Levy on March 6, 2008. (Dkt #1).

## SUMMARY OF PLAINTIFF'S RESPONSE:

Plaintiff Berndt's objections to Defendant Levy's Motion for Partial Summary Judgment are summarized as follows:

1. *Defendant Levy claims because Dr. Kramer was insured by the Kansas Health Care Stabilization Fund for $800,000.00, this court must cap, as a matter of law, Plaintiff's damages in this legal malpractice action at $800,000.00 because this is the only amount that would have been "collectable".*

First, a thorough review of Kansas legal malpractice law does not indicate that a Plaintiff must always prove a judgment is "collectable" in an underlying personal injury case. Plaintiff Berndt has an absolute right to recover all his injuries and damages incurred as a result of Dr. Kramer's negligence; not merely the amount of Dr. Kramer's insurance coverage. PIK 171.02; PIK 171.06; Even assuming there is a requirement that Plaintiff prove the medical malpractice

13

judgment was collectable, there is adequate evidence in the record that Dr. Kramer could have satisfied any excess judgment up to the amount requested in the medical malpractice pretrial order.

2.      *Defendant Levy claims Plaintiff Berndt can not collect any amount paid or to be paid under his Worker's Compensation Insurance and that these amounts must be deducted from Dr. Kramer's $800,000.00 Kansas Health Care Stabilization Fund coverage. Defendant Levy further claims that the legal fees Mr. Berndt would have been required to pay Robert Levy must be further deducted from the $800,000.00 coverage.*

Any benefits Plaintiff received or will receive from his Worker's Compensation Insurance are a collateral source and not admissible in the medical malpractice action or the legal malpractice action. There is no exception to the Kansas Collateral Source Rule for legal malpractice actions or for worker's compensation insurance. The Worker's Compensation lien against the third party tortfeasor is now unenforceable, as the statute of limitations expired at the time the subrogation lien was asserted.

There is simply no legal or factual basis to subtract legal fees that would have been paid to the negligent lawyer. This would be compensating Mr. Levy for his own negligence; and require Plaintiff Berndt to pay legal fees twice for one recovery.


# ARGUMENTS AND AUTHORITIES

## 1.    STANDARD OF REVIEW

The standards governing summary judgment are well known. However, certain points bear close consideration here. Obviously, Defendant Levy, as the moving party, has the burden of proof. *Med James, Inc. v. Barnes*, — Kan. App. 2d —, 61 P.3d 86, 91 (2003). To sustain this burden, Defendant Levy "must show there is no genuine issue as to any material fact and that [he

is] entitled to judgment as a matter of law." *Id., citing Schultz v. Schwartz,* 28 Kan. App.2d 84,

88, 11 P.3d 530 (2000). Mr. Levy's burden can be summarized as follows:

> Generally, it must appear *conclusively* that there remains no genuine issue as to a material fact and that one of the parties is entitled to judgment as a matter of law. A mere surmise or belief on the part of the trial court, no matter how reasonably entertained, that a party cannot prevail upon at trial will not justify a summary judgment where there remains a dispute as to a material fact which is not clearly shown to be sham, frivolous or so unsubstantial that it would obviously be futile to try it.

*Montoy v. State,* – P.3d –, 2003 WL 160768, quoting *Green v. Kaesler-Allen Lumber Co.,* 197

Kan. 788, 790, 420 P.2d 1019 (1966). (emphasis original.)

To successfully oppose Defendant's motion for partial summary judgment herein, Plaintiff Berndt only needs to "come forward with evidence to establish a dispute as to a material fact." *Med James, Inc.*, 61 P.3d at 91 *citing Saliba v. Union Pacific R.R. Co.,* 264 Kan. 128, 131, 955 P.2d 1189 (1998); *Glenn v. Fleming,* 247 Kan. 296, 305, 799 P.2d 79 (1990); *Slaymaker v. Westgate State Bank,* 241 Kan. 525, 531, 739 P.2d 444 (1987). As will be seen below, Plaintiff has met his burden of proof to defeat Defendant Levy's motion for partial summary judgment.

## 2. PLAINTIFF HAS MET HIS BURDEN TO ESTABLISH THE ESSENTIAL ELEMENTS OF HIS LEGAL MALPRACTICE CLAIM AGAINST ATTORNEY LEVY:

The elements of legal malpractice are: (1) the existence of an attorney-client relationship giving rise to a duty; (2) that the attorney breached that duty by act or omission; (3) that the attorney's breach of duty proximately caused injury to the client; and (4) that the client sustained actual damages. See *Phillips v. Carson*, 240 Kan. 462, 731 P.2d 820 (1987); *McConwell v. RMG of Kansas City, Inc.*, 18 Kan. App.2d 839-845, 861 P.2d 830 (1993). Defendant Levy does not

challenge that Plaintiff has established items (1) through (4).

In addition, to prove legal malpractice in the handling of litigation, a Plaintiff must establish the validity of the underlying claim by showing that it would have resulted in a favorable judgment had it not been for the attorney's error.  *Canaan v. Bartee*, 276 Kan. 116 72 P.3d 911 (2003), cert denied 540 U.S. 1090, 124 S.Ct. 962, 157 L.Ed. 2d 795 (2003);

In the instant motion, Defendant Levy does not challenge that Plaintiff can not show he would have received a favorable judgment but for the attorney's error.  Rather, Defendant Levy claims that because Dr. Kramer was only insured for $800,000.00, this court, as a matter of law, must set the amount of Dr. Kramer's Fund coverage as a ceiling on the amount of damages Plaintiff Berndt could have "collected" in his medical malpractice action.  Defendant Levy's argument is without merit.

# 3.   DAMAGES RECOVERABLE IN LEGAL MALPRACTICE ACTIONS:

## A.   PLAINTIFF HAS A RIGHT TO  SEEK AND OBTAIN ALL HIS DAMAGES INCURRED:

A plaintiff in a legal malpractice action is entitled to recover for the loss sustained as a proximate result of the Defendant's malpractice.   Where an attorney is alleged to have mishandled a personal injury claim, this loss is measured by the amount of damages the Plaintiff actually could have recovered if the claim had been properly handled, and includes all items of damages which could have been recovered in an action on the claim.   *See, Canaan v. Bartee*, 276 Kan. 116, 120, 72 P.3d 911,cert. denied 540 U.S. 1090 (2003).  The theory of an award of

16

damages in a personal injury or other tort case is that the injured party should be placed in the position he would have been in if the injury had not occurred, so far as this can be accomplished with a monetary award.

Further, had Plaintiff Berndt obtained an "excess" judgment against Dr. Kramer in the underlying medical malpractice case, Plaintiff would have had a right to execute on Dr. Kramer's assets, garnish his wages or seek other means to collect his judgment.

> In Kansas, under these statutes [K.S.A. 60-2403, *et seq.*]  a party may, by the *issuance* of an execution every five years, keep a judgment alive indefinitely. The judgment remains in force without execution for five years, and the plaintiff may revive it at any time within two years if it has become dormant thereafter, so that a plaintiff may neglect his judgment for seven years, lacking a day, and then revive it and put it in force for five years more. (Emphasis supplied.)

*Johnson Brothers Wholesale Liquor Co. v. Clemmons*, 233 Kan. 405, 407-08, 661 P.2d 1242, cert. denied 464 U.S. 936 [104 S.Ct. 345, 78 L.Ed.2d 311] (1983).

## B.     THE  COLLECTABILITY ISSUE:

The fact Dr. Kramer had an $800,000.00 insurance policy from the Health Care Stabilization Fund and a 3 million dollar insurance policy from PLICO is irrelevant to any issue in this case.  First, under current Kansas Law, the amount of Dr. Kramer's insurance coverage is not admissible in this action; just like the amount of Defendant Levy's insurance coverage is not admissible in this action.  F.R.E.§411.   Therefore, the amount of insurance is irrelevant to any issue in this case.  F.R.E.§402.

Defendant Levy bases his allegation that Plaintiff must prove the collectability of the underlying medical malpractice judgment on Kan. PIK 123.41.  This instruction states:

> In order to recover damages from a lawyer for negligence in the handling of a lawsuit, the plaintiff must establish: (1) that the lawyer was negligent; (2) that but

for such negligence the prior lawsuit would have resulted in a collectible judgment in plaintiff's favor.   PIK 123.41.

The PIK comments cite *Dings v. Callahan*, 4 Kan. App.2d 36, 602 P.2d 542 (1979) and *Webb v. Pomeroy*, 8 Kan. App.2d 246, 655 P.2d465 (1982), as authority for this instruction.   A review of the *Dings* case, however, is not helpful as the word "collectable" or any derivative of the word "collectable" does not even appear in the *Dings* opinion.   In the *Webb* case, the court states a Plaintiff **"may"** be asked to prove the collectability of a judgment.   *Webb*, at 467-468. The *Webb* court makes no other comments or statements about collectability.

The *Webb* court cited a thirty-year-old treatise as authority for its statement that a Plaintiff "may" be required to prove collectability.   A review of this legal treatise does not shed much light on the collectability provision.   The *Meiselman* treatise states, "there are jurisdictions that require the Plaintiff prove . . . the judgment in favor of the client in the underlying action would have been collectable."   *Meiselman* at 43, attached as Exhibit 23).   *Meiselman*, however, does not cite any Kansas cases for this proposition; and further, the cases cited by *Meiselman* are from 1850 through 1964.   The treatise goes on to state,

> The solvency requirement is intended to demonstrate whether the original defendant (or the plaintiff on a counterclaim) could have paid a judgment, had one been rendered against him.   For example, in *Sitton v. Clements*, where plaintiff received an award of approximately $162,000.00 against his attorney, the appellate court reduced it to $81,000.00 based on evidence that the defendant in the underlying suit could not have satisfied the larger judgment.   Similarly, in *Jones v. Wright*, plaintiffs, third party beneficiaries of a will, suing to collect against an attorney for his negligence in will drafting, had to establish that the executor was solvent.

*Meiselman*., at 44, *citing Sitton v. Clements*, 257 F.Supp. 63 (ED Tenn, 1966);   *Jones v. Wright*, 19 Ga App. 242, 91 SE 265 (1917).

18

In *Webb*, two Pomeroy brothers, one an attorney and the other a real estate agent, were sued for legal malpractice and fraudulent misrepresentation involving a real estate transaction. The transaction involved the transfer of interest in the Webb's land to a third party in order to prevent foreclosure. According to the Webbs, the Pomeroys continually promised to secure repurchase rights from the third party and repeatedly indicated they had done so. Later when it was determined that the third party was considering selling the land, the Webbs learned there had never been a valid repurchase agreement. In directing a verdict for the Pomeroy attorney, the appellate court wrote:

> Thus, the plaintiff in a legal malpractice case has not only to prove the four basic elements as in all negligence cases but **may** be asked to prove three additional factors: that the underlying claim was valid; that it would have resulted in a favorable judgment had it not been for the attorney error; and that the judgment was collectable." Meiselman, *Attorney Malpractice: Law and Procedure*: §3:5 at 44 (1980).

*Webb* at 467-468(emphasis added). The court then concluded the Webbs failed to prove their underlying suit. The *Webb* court never commented, other than the above, on the collectability issue.

*Canaan v. Bartee* is an often cited Kansas Supreme Court legal malpractice case from 2003. *Canaan v. Bartee*, 276 Kan. 116, 72 P.3d 911 (2003). In *Canaan*, the Kansas Supreme Court summarized "Kansas Law Regarding Legal Malpractice". *Id*., at 120-122.

> Our appellate courts have stated the following requirements in regard to legal malpractice cases in general: In order to prevail on a claim of legal malpractice, a plaintiff is required to show (1) the duty of the attorney to exercise ordinary skill and knowledge, (2) a breach of that duty, (3) a causal connection between the breach of duty and the resulting injury, and (4) actual loss or damage." *Bergstrom v. Noah, 266 Kan. 847, 874, 974 P.2df 531 (1999).* In addition to those four elements, to prove legal malpractice in handling of litigation, a plaintiff must establish the validity of the

19

> underlying claim by showing that it would have resulted in a
> favorable judgment in the underlying lawsuit had it not been for
> the attorney's error.   *Webb v. Pomeroy, 8 Kan.App2d 246, 249,*
> *655 P.2d 465 (1982).*

*Id.*, at 120.

The *Canaan* court cited the *Webb* case, however, the *Canaan* court did not include the

provision that plaintiff  "may" be required to prove the judgment was collectable.   Numerous

other Kansas legal malpractice cases, involving litigation, after *Canann,* likewise, have not

mentioned or held that the Plaintiff "may" be required to prove the judgment was collectable.

*See, Holmes v. Boal*, 2005 WL 2122315 (D. Kan.); *Dupree v. Sutton*, 120 P.3d 808, 2005 WL

2495875 (Kan. App.);  *Day Advertising Inc., v. Clark, Day Advertising, Inc. v. Clark*, 212 P.3d

1039, 2009 WL 2436696 (Kan. App.); *Hamilton v. Becker,* 2009 WL 1212715 (Kan. App.);

*Davison v. Kenny*, 191 P.3d 363, 2008 WL 4068176 (Kan. App.).

Since the 1982 *Webb* case, only a couple of Kansas legal malpractice cases have cited the

*Webb* case.   In 1997, the excerpt from the *Webb* case, including the Meiselman treatise cite, was

quoted verbatum in *Augustine v. Adams*, 1997 WL 298451 (D. Kan).   In *Augustine*, Plaintiff

asserted legal malpractice against the attorneys for their failure to file a motion under K.S.A. §

60-260(b) to review a state court's order admitting a will to probate. The court held the Plaintiff

had not demonstrated that she suffered any actual damages as a result of the Defendant's alleged

breach. *Augustine.*, at 3.   Like *Webb*, the *Augustine* court did not comment on the collectability

issue.

The *Webb* case was also cited in a trilogy of Kansas cases involving a criminal

Defendant.  *Ellibee v. Fox*, 2006 WL 2802207 (D. Kan); *Ellibee v. Hazlett*, 2006 WL 3050801

(D. Kan); and *Ellibee v. Hazlett*, 2006 WL 3050802 (D. Kan).    In each of these cases, Judge

Julie Robinson quoted Kan. PIK 123.41 verbatim, and cited the *Webb* and *Augustine* cases as authority. *Id.* Again, however, the court provided no guidance as to when and how collectability is an issue.

There are simply no Kansas cases where a court has commented on the collectability of a judgment in the underlying lawsuit, other that to state the Plaintiff "may" be required to show the judgment was collectable.  There are no Kansas cases defining in what circumstances must collectability be shown; what proof is necessary to prove collectability, at what point in time must it be shown the judgment is collectable; or why it is necessary for a Plaintiff to show the judgment would be collectable.

Contrary to the Kansas Pattern Instruction No. 123.41 on Proof of Damages in a Legal Malpractice Action, it does not appear that the majority of current Kansas legal malpractice cases require a Plaintiff to show the prior lawsuit would have resulted in a collectible judgment in Plaintiff's favor.  The Comments to PIK 123.41 are not helpful in understanding this instruction; and a review of Kansas Case law does not support use of this instruction.

The collectability of a judgment should be irrelevant in any negligence case.  In the underlying medical malpractice action, Dr. Kramer did not need to produce evidence of his ability to pay a judgment; and Plaintiff should not be required in the legal malpractice case to put on evidence that Dr. Kramer would have been able to satisfy any judgment imposed upon him. In the alternative, if Plaintiff is required to prove to a jury that any judgment would be "collectable", then Plaintiff will be required to introduce evidence of Dr. Kramer's liability insurance coverage and evidence of the nature of Dr. Kramer's orthopedic practice including the revenues generated from his orthopedic practice, both in Kansas and Oklahoma.

**C.**   **PLAINTIFF HAS ADEQUATELY ESTABLISHED THAT A JUDGMENT IN THE UNDERLYING MEDICAL MALPRACTICE ACTION FOR THE AMOUNT REQUESTED IN THE PRETRIAL ORDER COULD HAVE BEEN COLLECTED FROM DR. GARY KRAMER.**

Assuming Kansas law does require a Plaintiff in a legal malpractice case, involving underlying medical malpractice, to prove the collectability of the underlying judgment, Plaintiff Berndt can do so in this action.

The question of Dr. Kramer's financial worth and solvency was not addressed in the underlying medical malpractice action.  Any efforts by Plaintiffs in medical malpractice actions to inquire into the financial status of physicians are generally objected to as being irrelevant, oppressive and an invasion of the physician's privacy rights.  Unfortunately, Dr. Kramer died on February 3, 2008, so it is now impossible to establish the financial stability or solvency of Dr. Kramer through his own testimony. (Exhibit 19, Social Security Death Record)

Nonetheless, in this action, Plaintiff has produced credible evidence of Dr. Kramer's financial stability and solvency through the affidavits of Steve Brave, and Jerry Levy.  (See Plaintiff's Statements of Uncontroverted Facts No. 2, and  3 ).  Moreover, Dr. Kramer's own CV reveals that he had an active, thriving orthopedic practice while in Garden City, Kansas (Exhibit 12; Kramer CV).   Dr. Kramer's testimony in the Berndt medical malpractice action indicates that he had an active practice in both Garden City, Kansas and Muskogee, Oklahoma.  (Exhibit 16; Kramer Deposition, Case No. 03-1283).   From the time Dr. Kramer completed medical school until after this case would have been tried in January 2005, Dr. Kramer practiced full time

as an orthopedic surgeon. (See Plaintiff's Statement of Uncontroverted Fact 6, *infra*).  A PACER search of the bankruptcy records reveals that Dr. Kramer never filed for bankruptcy in any of the states where he has resided. (See Plaintiff's Statement of Uncontroverted Fact 6, *infra*).

A review of Kansas, Oklahoma and United States Wage Survey information from the United States Bureau of Labor Statistics provides reliable evidence as to conservative estimates of Dr. Kramer's probable annual income.  (See Plaintiff's Statement of Uncontroverted Fact 11, 12 and 13, *infra*).

The **Kansas** Wage Survey for 2002 lists the mean annual salary for Kansas Surgeons at $196,640.00.   While the State of Kansas does not have a listing for experienced orthopedic surgeons, an experienced orthopedic surgeon's average salary would certainly not be less than the mean salary for all surgeons combined.  (Exhibit 22)

The **Oklahoma** Wage Survey for 2003 through 2005 lists the mean annual salary for all surgeons combined at $208,910.00;  $197,930.00 and  $194,520.00.  This includes surgeons with zero experience and surgeons with many years of experience.  The category also includes general surgeons, as well as orthopedic surgeons.  The Oklahoma City wage survey for 2003 lists the mean annual salary for all surgeons combined at $209,040.00. (Exhibit 22)

Finally, the **United States Bureau** of Labor's Wage Survey for 2005 lists the mean annual salary for all surgeons combined at $177,690.00.  This includes surgeons with zero experience and surgeons with many years of experience; and the category also includes general surgeons, as well as orthopedic surgeons.  For "office based" surgeons, like Dr. Gary Kramer's practice, the annual wage is listed at $184,350.00.[2]   (Exhibit 22).

---

[2] Under F.R.E. 902(5), the U.S. Bureau of Labor Statistics are self-authenticating as official state and national publications. The court can take judicial notice of this data pursuant to F.R.E. 201(c).

There is ample evidence in the record to establish that Dr. Kramer would have been able to satisfy a judgment in the underlying medical malpractice action up to the amount requested in the pretrial order of Two Million Four Hundred Seventy-Nine Thousand Dollars. ($2,479,000.00), either by seizure of his assets, garnishment of his wages or simply by payment of money.  The burden of proof should now shift to Defendant Levy to establish that Plaintiff could not have collected his judgment from Dr. Kramer.

Many jurisdictions hold that the collectability of a judgment is in the form of an affirmative defense and the issue of noncollectability of a judgment must be proved by the Defendant.  *See, Carbone v. Tierney*, 151 N.H. 521, 864 A.2d 308 (2004);  *Lindenman v. Kreitzer*, 7 A.D. 3d 30, 775 N.Y.S. 2d 4 (App. Div. 1st Dep't 2004);  *Kranz v. Tiger*, 390 N.J. Super. 135, 914 A.2d 854 (App. Div. 2007);  *Teodorescu v. Bushnell, Gage, Reizen & Byington*, 201 Mich. App. 260, 506 N.W. 2d 275 (1993);  *Kituskie v. Corbman,* 552 Pa. 275, 714 A.2d 1027 (1998).

4.    **W**ORKER'S **C**OMPENSATION **B**ENEFITS ARE A **C**OLLATERAL **S**OURCE AND THEREFORE **N**OT **A**DMISSIBLE IN THE **M**EDICAL **M**ALPRACTICE **A**CTION OR THE **L**EGAL **M**ALPRACTICE **A**CTION.

The current status of the collateral source rule as it applies to legal malpractice cases was recently written about by Defendant Levy's counsel, Rachel Rolf, in the December 15, 2008 edition of the American Bar Association Journal.  Ms. Rolf wrote:

> 'The collateral source rule permits an injured party to recover full compensatory damages from a tortfeasor irrespective of the payment of any element of those damages by a source independent of the tortfeasor.' *Johnson v. Baker*, 11 Kan.

App.2d 274, 278, 719 P.2d 752, 756 (1986) (internal citations omitted). This rule acts to bar the introduction of evidence of benefits paid by a collateral source, including payments or services rendered gratuitously and those arising out of an obligation, unless the evidence has an independent basis for admissibility, and is probative of an issue not related to the measure of damages. *Johnson v. Baker*, 11 Kan. App.2d 274, 278, 719 P.2d 752, 75f6 (1986).

Rolf, R., *Legal Malpractice Law, State of Kansas*, American Bar Association, Section of Litigation, Dec., 15, 2008. (Exhibit 24).

Given Defendant Levy's counsel's written statements just ten (10) months ago concerning the collateral source rule in Legal Malpractice actions, it is hard to comprehend why Defendant Levy believes in this legal malpractice action, Mr. Berndt's worker's compensation benefits should be deducted from any judgment or that this information is in any way relevant or admissible at the time of trial.

Kansas law is clear. Worker's compensation benefits are a collateral source; and these benefits and evidence of an employer's subrogation lien are inadmissible in a worker's action against a third-party tortfeasor. K.S.A. 44-504(b).

Plaintiff has cited no Kansas cases wherein evidence of worker's compensation benefits recovered by an employee was admissible in a negligence action. This question is governed by the collateral source doctrine which prohibits disclosure of additional sources of compensation**. The general rule is that worker's compensation benefits are inadmissible.** 22 Am. Jur.2d Damages § 209. Kansas is in accord and has so held in *Negley v. Massey Ferguson, Inc*., 229 Kan. at 473, 625 P.2d 472. ....

Disclosure of workers' compensation presents the same danger of prejudice as does the disclosure of insurance in other actions. Likewise, **an employer's subrogation lien** under K.S.A. 1984 Supp. 44-504(b) or workers' compensation **is inadmissible** as an additional source of compensation. *McGraw v. Sanders Co. Plumbing & Heating, Inc*. 233 Kan. At 769, 667 P.2d 289.

*Anderson v. National Carriers, Inc*., 695 P.2d 1293, 10 Kan. App.2d 203 (1985)(emphasis added). "Kansas adheres to the collateral source doctrine, *Anderson v. National Carriers, Inc*.,

10 Kan. App.2d 203, 695 P.2d 1293, 1298-99 (Kan. 1985) (holding that receipt of workers'

compensation benefits does not reduce recovery against negligent tortfeasor. *Sanjuan v. IBP*,

*Inc.*, 160 F.3d 1291, 1299-1300 (1998).

The most current Kansas Case on collateral source benefits is *Adamson v. Bicknell*, 41

Kan. App.2d 958, 207 P.3d 265 (2009) which was handed down on May 15, 2009. *Adamson*

holds that there are only two exceptions to the Kansas Collateral Source Rule, one for medical

expenses written off because of Medicaid reimbursement; and two, for medical expenses written

off by a Medicare provider, if and only if, the Medicare provider is also the named Defendant in

the action and that Medicare provider provides post-tort medical care to the injured party.

*Adamson*, syl. ¶ 6. The court further stated,

> The admission into evidence of expenses that have been paid by a third party is
> governed by the common law collateral source rule.  The rule generally dictates
> that 'benefits received by the plaintiff from a source **wholly independent of and
> collateral to the wrongdoer will not diminish the damages** otherwise
> recoverable from the wrongdoer.' [citation omitted.]
>
> The collateral source rule permits an injured party to recover full compensatory
> damages from a tortfeasor irrespective of the payment of any element of those
> damages by a source independent of the tortfeasor.' [citations omitted.]

*Adamson* at 968 (emphasis added).

> Plaintiff's collateral sources of compensation cannot be inquired into as part of a
> defendant's case, because of the danger that a jury will be inclined to find no
> liability, or to reduce the damage award, when it learns that plaintiff's loss is
> entirely or partially covered.

*Moses v. Union Pacific Railroad v. MidSouth Milling Co.*, 64 P.3d 413 (1995).

A.   **WHETHER THE WORKER'S COMPENSATION CARRIER HAS
      A SUBROGATION INTEREST AGAINST ANY TORT
      RECOVERY PLAINTIFF ACHIEVES IN THIS CASE?**

In the original case of *Berndt v. Kramer* filed by Defendant Levy, the worker's compensation carrier filed a motion to intervene pursuant to K.S.A. 44-504(b). The worker's compensation carrier sought to protect its subrogation interest for any tort recovery that might be duplicative.[3]

However, the motion to intervene was filed <u>after</u> Defendant Levy filed the medical malpractice action, which was dismissed with prejudice for being outside the statute of limitations. Therefore, the worker's compensation carrier's subrogation interest against the third party tortfeasor was extinguished as well. It may be that the worker's compensation carrier has a cause of action against Defendant Levy for failure to protect its subrogation interest. It may be that the worker's compensation carrier was negligent itself in failing to protect its own interests when it didn't file a third party action as contemplated by K.S.A. 44-504(c). In any event, Defendant Levy has no legal interest in the worker's compensation subrogation lien and therefore no standing to assert the lien as some sort of defense to damages in the case filed against him. Moreover, there is no evidence of what the worker's compensation carrier paid out in worker's compensation benefits that were not caused by the third party tortfeasor. And there is no legal authority or precedent that an extinguished lien can be used to reduce the damages Mr. Berndt is legally entitled to pursue in this underlying action.

Defendant Levy argues that if Plaintiff's worker's compensation benefits, past and future, are not admitted into evidence, Plaintiff will receive a "windfall". Once again, Defendant Levy

---

[3] Keep in mind that Mr. Berndt was injured on the job and it was the substandard medical care that aggravated his injury and resulted in the amputation. The worker's compensation carrier would have been required to pay benefits to Mr. Berndt even in the absence of the alleged substandard medical care, none of which would be recoverable in the third party action, because Mr. Berndt suffered an on-the-job injury wherein he fractured his calcaneous. The

has ignored controlling Kansas Law.  "Double recovery by a Plaintiff is acceptable so long as the source of such payment is unconnected to the tortfeasor." *Hayes Sight & Sound, Inc. v. ONEOK, Inc.*, 281 Kan. 1287, 136 P.3d 428 (2006)(*quoting, Estate of Farrell ex rel. Bennett v. Gordon*, 770 A.2d 517 (De.2001).  "Under the collateral source rule, double recovery by the Plaintiff is acceptable where the Defendant has not paid the full amount of Plaintiff's damages." *Hayes*, syl.¶ 8.  "The fact a workman has received compensation from his employer for the same injury constitutes no defense, or partial defense, to a negligent third party in an action against the third party by the workman for damages."  *Baker v. Zecker*, 179 Kan. 596, 296 P.2d 1085 (1956).

## 5.     THERE IS NO KANSAS AUTHORITY TO DEDUCT ATTORNEY FEES THAT WOULD HAVE BEEN PAID IN THE UNDERLYING LITIGATION FROM A JUDGMENT IN THE LEGAL MALPRACTICE ACTION.

Defendant cites no Kansas cases to support the allegation that the attorney fees Plaintiff Berndt would have paid Defendant Levy, had he successfully won Plaintiff's medical malpractice action against Dr. Kramer, must be deducted from any judgment Plaintiff Berndt receives in the legal malpractice action. This standard would reward Defendant Levy for his negligent conduct; and require Mr. Berndt to pay double attorney fees.  Unfair, to say the least.

The law holds, however, that Plaintiff Berndt is entitled to claim the additional litigation expenses he has incurred as a result of having to file an additional lawsuit in order to recover for the injuries and damages he incurred as a result of Defendant Levy's negligence.  *See Wilshire Oil Co. Of Tex v. Riffe*, 409 F.Supp 1277, 1285 (10th Cir. 1969); *Jenkins v. St. Farm & Marine*

original injury required medical treatment, time off work and most likely some degree of permanent impairment,

*Ins. Co.*, 393 So.2d 851 (La. App. 1981), aff'd 422 So.2d 1109 (La. 1982).

<u>CONCLUSION</u>

Plaintiff Berndt respectfully requests this Court deny Defendant Levy's Motion for Partial Summary Judgment for the reasons stated above.

Respectfully Submitted:

WARNER LAW OFFICES, P.A.

By: <u>/s/ Anne H. Pankratz</u>
     ANNE H. PANKRATZ, #12941
     Attorney for Plaintiff

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that on this 23rd day of October, 2009, a true and correct copy of the above and foregoing Plaintiff's Response to Defendant Robert A. Levy's Motion and Memorandum for Partial Summary Judgment was presented to the clerk of the court for filing and uploading to the CM/ECF system which will send a notice of electronic filing to the following:

Daniel F. Church
McAnany, VanCleave, and Phillips
5125 Roe Boulevard, Suite 200

even in the absence of subsequent substandard medical care that led to the eventual amputation and further injury.

Roeland Park, Kansas 66205
(913) 371-3838
(913) 262-1991, fax
dchurch@mvplaw.com Daniel Church
*Attorney for Defendant Levy*

/s/ Anne H. Pankratz
ANNE H. PANKRATZ, #12941
Attorney for Plaintiff