IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS


FREDERICK "GUY' BERNDT,   )
   )
        Plaintiff,   )
   )
v.   )   No.  08-1067-WEB
   )
ROBERT A. LEVY,   )
   )
        Defendant.   )
   )


**<u>Memorandum and Order</u>**

Plaintiff Frederick Berndt filed this action claiming legal malpractice against defendant

Robert Levy.  Levy is an attorney who represented Berndt in a prior medical malpractice action

against Berndt's treating physician.  Plaintiff's claim in the medical malpractice action was

dismissed on summary judgment because it was not filed within the applicable two-year

limitations period.  Berndt claims that Levy's negligence led to the dismissal of the prior claim

and caused Berndt to be deprived of a collectible judgment in his favor.

The matter is now before the court on the following motions: Plaintiff's Motion to

Exclude Testimony of Brad Ralph (Doc. 101); Plaintiff's Motion to Exclude Testimony of Harry

Bleeker (Doc. 103); Plaintiff's Motion to Exclude Testimony of Bud Langston (Doc. 122);

Plaintiff's Motion for Partial Summary Judgment (Doc. 105); Defendant's Motion for Partial

Summary Judgment (Doc. 82); and  Defendant's Motion to Bifurcate (Doc. 76).

**I.  _Background_**.

The following background comes primarily from the appeal of the prior medical

malpractice lawsuit, _Berndt v. Kramer_, 249 Fed.Appx. 45, 2007 WL 2733713 (10th Cir. 2007).

On June 9, 2000, Berndt was working at the Stanton County Landfill when he suffered a calcaneous fracture to his right heel.  He was treated by Dr. Gary Kramer, who operated on June 14, 2000, to repair the fracture.  Berndt saw Dr. Kramer again on July 6, 2000.  On July 18, 2000, Dr. Kramer told Berndt the wound was infected.  Two days later, Kramer examined Berndt again and sent him to the hospital to receive a shot for the infection.  Berndt was concerned about Kramer's care because the wound continued to drain and discharge discolored fluids, but he was reassured by Kramer.  On August 4, 2000, Dr. Kramer operated again to irrigate and aerate the wound.  A culture done that day revealed the presence of pseudomonas, a bacteria that was causing the infection.  According to Berndt, Dr. Kramer told him the bacteria was just a "foot bug" and he should not worry about it.

Because Dr. Kramer would not say how bad the infection was, the worker's compensation carrier for plaintiff's employer sent Berndt to see another orthopaedic surgeon, Dr. Gilbert, on September 1, 2000.  Mr. Berndt testified in a deposition in the suit against Dr. Kramer that Gilbert had told him he had a "very bad infection" which he would "take to the grave with" him.  Mr. Berndt testified that he understood Gilbert's comments to mean that although treatment may "put it to sleep," the infection was "going to always be there" and "even a bad cold could wake it up."  He also testified that Dr. Gilbert said he might have just "left the foot" and not performed the surgery, but indicated that whether or not to operate is a "doctor's decision."  Berndt also testified that Dr. Gilbert did not criticize Dr. Kramer's care, indicating instead that the antibiotics prescribed by Kramer "should do the trick."

Dr. Kramer referred Berndt to Dr. Peterie, a specialist in infectious disease.  On or about October 24, 2000, Dr. Peterie allegedly told Berndt that he had permanent tinnitus (ringing in the

ears) and possible kidney damage from the antibiotics prescribed by Dr. Kramer. Dr. Peterie allegedly recommended that the foot be amputated because it was broken so badly it "wasn't worth a darn" even if the infection could be treated.

An examination by Dr. Shields in February 2001 revealed fluid in the bone around the fracture, indicating the spread of the infection in the bone. Dr. Shields presented Mr. Berndt with three treatment options, including amputation. Mr. Berndt chose that course, and on March 7, 2001, his leg was amputated below the knee.

The complaint alleges that plaintiff contacted defendant Robert Levy, an attorney in Garden City, Kansas, in March of 2002 to represent him on a pending workers' compensation claim and potential medical malpractice claims. Plaintiff signed a written employment contract with Robert Levy on March 11, 2002. The parties agree that an attorney-client relationship existed between plaintiff and Robert Levy at all times material to this action.

On October 24, 2002, Robert Levy, on behalf of Mr. Berndt, filed a petition requesting a medical malpractice screening panel pursuant to K.S.A. § 65-4901. The parties agreed to dismiss the panel in July 2003, and on August 5, 2003, Robert Levy filed suit on plaintiff's behalf in federal district court, alleging malpractice against Dr. Kramer. The district court subsequently granted a motion by Dr. Kramer for summary judgment, finding plaintiff's medical malpractice claim was filed outside of the two-year limitation period. The Tenth Circuit affirmed the ruling, noting that the limitations period begins to run when an injury is "reasonably ascertainable," and that when an injury is a result of a medical procedure, the injury is reasonably ascertainable either when the plaintiff has reason to know the injury is permanent or when the plaintiff has reason to suspect negligence. When a plaintiff has reason to know the

injury is permanent, the court said, the cause of action accrues even if the plaintiff is not then aware that negligence caused the injury. The court held as a matter of law that Mr. Berndt's injury (i.e., the infection) was reasonably ascertainable as of September 1, 2000, when Dr. Gilbert examined him "and informed him the infection was serious and permanent." The limitations period thus expired by September 1, 2002, before Mr. Berndt sought a medical malpractice screening panel or filed suit.

Robert Levy had previously spoken to attorney Jerry Levy, an attorney in Lawrence, Kansas, about possibly consulting on plaintiff's medical malpractice claim against Dr. Kramer. On or about October 31, 2002, Robert Levy formally retained Jerry Levy to act as co-counsel on the case.

As noted above, the medical malpractice action was dismissed based on the statute of limitations. Plaintiff now contends that Robert Levy's failure to file that case within the statute of limitations was due to professional negligence.

**II.** ***Motions to Exclude Testimony***.

A. Brad Ralph. Defendant has retained attorney Brad Ralph to render certain expert opinions. Doc. 108, Exh. 18. Based on his review of case materials, Ralph expressed three opinions, which are summarized here. First, a client has a duty to inform his attorney of all known material facts relating to his claims. Ralph states that plaintiff had a duty "to inform Robert Levy of the information Dr. Gilbert had provided to Mr. Berndt regarding the infection." Ralph states that plaintiff breached his duty to inform Levy "of material information that ultimately affected the statute of limitations...." Second, Ralph states that Robert Levy did not have a duty to contact Dr. Gilbert to discuss plaintiff's September 1, 2000 appointment. Ralph

says it was within the standard of care for Robert Levy to rely upon the information provided to him by the plaintiff and the information in Dr. Gilbert's written medical records. To the extent the Tenth Circuit relied on Dr. Gilbert's oral statement to plaintiff that he would "take the infection to the grave," Ralph opines that Robert Levy was not negligent in failing to identify September 1, 2002 as the end of the limitations period. Ralph states that "the standard of care does not require an attorney to file a cause of action early, in advance of the date that he/she has identified as the statute of limitations expiration." He adds that "[a]n attorney is within the standard of care to file the cause of action (or screening panel) on the date identified as the statute of limitations expiration." Third, Ralph opines that if attorney Jerry Levy believed that the statute of limitations had expired as a result of Robert Levy's inaction, then Jerry Levy had a duty to so inform the plaintiff and to recommend that he retain separate counsel to evaluate a potential claim against Robert Levy. Ralph opines that Jerry Levy's failure to do so precluded the opportunity for the plaintiff to mitigate his damages.

Plaintiff moves to exclude this testimony, arguing it is "irrelevant, unreliable, prejudicial, speculative, and would confuse and mislead a jury." Doc. 101 at 2. Plaintiff argues the opinions are outside Ralph's area of expertise because he has no training, qualifications or experience as a plaintiff's attorney in a medical malpractice case. *Id*. at 12. Plaintiff also contends that Ralph was unable to offer an opinion on numerous issues essential to whether Robert Levy met the standard of care, and that his opinions about Jerry Levy are irrelevant because Jerry Levy was not retained until after the statute of limitations had already run. In response, defendant contends that plaintiff's arguments go the weight of Ralph's opinions, not their admissibility. Doc. 118 at 2. Defendant contends Ralph's experience and training qualify him to offer such opinions, and

that he appropriately relied upon the record in forming these opinions.  Defendant contends it was reasonable for Ralph to decline to give opinions on hypotheticals posed by plaintiff's counsel that "had no basis in fact," *Id.* at 8, and that his testimony should not be excluded for a refusal to speculate on Robert Levy's level of knowledge or state of mind during the underlying lawsuit.  As to Ralph's opinions about Jerry Levy, defendant contends that if Jerry Levy had advised plaintiff that the statute of limitations had already run, plaintiff "may have decided to settle the underlying case, which would have mitigated the damages he now claims are attributable to Robert Levy." *Id.* at 11.

Rule 702 of the Federal Rules of Evidence provides in part that if scientific, technical, or other specialized knowledge will assist the trier of fact in understanding the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.  Rule 702 requires the court to act as a "gatekeeper" for proposed expert testimony.  *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 969 (10th Cir. 2001). Under the rule, the court must first assess whether a proposed expert is qualified to render an opinion.  *Id.*  If the expert is qualified, the court must determine whether the expert's opinions are reliable under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and its progeny.  The purpose of the *Daubert* inquiry is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526

U.S. 137, 152 (1999).

The court finds that Mr. Ralph is qualified by knowledge, training, education and experience to express opinions on matters relating to the standard of care for practicing attorneys handling a medical malpractice claim in a community such as Garden City. Ralph is an experienced litigator who has practiced law in the Dodge City area for a number of years. The fact that this witness has defended medical malpractice claims in the past, as opposed to representing plaintiffs, does not in and of itself render him unqualified to express opinions on the standard of care applicable to Robert Levy's conduct. Moreover, after examining the specific opinions expressed by Mr. Ralph, the court concludes – with one exception – that they meet the standards of reliability required by *Daubert*.

Mr. Ralph first opined that plaintiff breached a duty to inform Robert Levy of all known material facts relating to his claim because he allegedly did not "inform Robert Levy of the information Dr. Gilbert provided to Mr. Berndt regarding the infection."[1] Contrary to plaintiff's assertion, Mr. Ralph's basis for reaching this conclusion has some support in well-established case law. It is undoubtedly true that a client has a duty to exercise reasonable care for his own protection. *See e.g., Pizel v. Zuspann*, 247 Kan. 54, 795 P.2d 42 (1990) ("[C]omparative fault principles apply to a legal malpractice action based upon negligence unless as a matter of law the client had no obligation to act on the client's own behalf."), *modified on denial of rehearing by*

_____

[1] Plaintiff's affidavit states that during his first several communications with Robert Levy, he answered all of Levy's questions and told Levy he had seen Dr. Gilbert on September 1, 2000 for a "second opinion." Plaintiff says he informed Levy that Gilbert told him the infection was severe and likely would be permanent. Doc. 108, Exh. 25. In Robert Levy's deposition, Levy denied that plaintiff had provided him such information. The record thus discloses a genuine issue of material fact as to whether plaintiff informed Robert Levy of statements made by Dr. Gilbert.

247 Kan. 699, 803 P.2d 205 (1990).  Consequently, if information is such that a reasonable person would know it is important for the protection of his lawsuit to convey it to his attorney, a failure to convey such information could be a breach of the client's duty of care.  On the current record, there is clearly a genuine dispute of fact as to whether or not plaintiff informed Robert Levy of Dr. Gilbert's oral comments – e.g., that plaintiff's infection was such that he would take it "to his grave."  There is also a genuine issue of fact as to whether reasonable person in plaintiff's position would have, in the exercise of due care, conveyed that information to his attorney.  As Mr. Ralph noted, the Tenth Circuit cited these oral comments (which were made to plaintiff during his September 1, 2000 visit with Dr. Gilbert) as the basis for concluding that the statute of limitations began to run on that date.  Plaintiff clearly remembered the comments, because he subsequently recounted them in a deposition in the medical malpractice case.  In his deposition, Mr. Ralph explained his review of the record and the basis for his conclusion that plaintiff breached a duty to relay such comments to Robert Levy.  Ralph reviewed various portions of the record, including deposition testimony, and explained why he believed plaintiff's alleged failure to tell Levy about these comments breached a duty of care.  His reasoning has some logical support, because the oral comments known to the plaintiff but (allegedly) not to Levy were key to the dismissal of plaintiff's medical malpractice claim.  Those comments did not appear in Dr. Gilbert's written record of the September 1 visit;  the doctor's report from that meeting made only one ambiguous reference to the "tenacious" nature of a bone infection.

For purposes of *Daubert*, the court concludes that the record shows an adequate basis for Ralph's testimony.  In considering the *Daubert* standard, the court's focus "should not be upon the precise conclusions reached by the expert, but on the methodology employed in reaching

those conclusions." *Daubert*, 509 U.S. at 595. Even if, as plaintiff contends, Ralph failed to adequately consider Robert Levy's role in failing to draw out the information from the plaintiff or in failing to otherwise obtain it, the court concludes that such matters go to the weight rather than the admissibility of his opinion. *Cf. Daubert*, 509 U.S. at 595 (vigorous cross-examination, presentation of contrary evidence and careful instructions are the traditional and appropriate means of attacking shaky but admissible evidence). Of course, the only issue at this point is whether a jury is entitled to hear Mr. Ralph's opinion, not whether the opinion itself is persuasive or credible. That will be up to a jury to determine. *Cf. Robinson v. Missouri Pacific R. Co.*, 16 F.3d 1083, 1090 (10th Cir.1994) (doubts about the helpfulness of expert testimony should generally be resolved in favor of admission).

Mr. Ralph's second set of opinions includes the assertion that Robert Levy did not have any duty to contact Dr. Gilbert to discuss plaintiff's September 1, 2000 appointment and it was "within the standard of care for Robert Levy to rely on the information provided to him by his client, Mr. Berndt, and the information contained in Dr. Gilbert's September 1, 2000 medical record." Thus, he concluded, Robert Levy was not negligent in failing to identify September 1, 2000 as the trigger date for the statute of limitations because, according to Levy, plaintiff failed to inform him of the doctor's oral comments. On the current record, the court cannot say as a matter of law that such an opinion by Ralph should be excluded. It is true, as plaintiff points out, that during his deposition Ralph was unable to answer several factual questions about Robert Levy's conduct, and that he declined to express any opinions beyond those included in his report. But Ralph answered questions about the materials he reviewed in reaching his conclusion, he explained the basis for his opinion, and his opinion has some logical support and

connection to the facts of the case. Plaintiff can of course present evidence that Levy had a further duty to investigate, but such evidence would not render Ralph's opinion inadmissible. Plaintiff can also argue to the jury that Ralph's opinion is not credible for the reasons cited by plaintiff. But under Kansas law, the standard of care for attorneys is established by members of the same profession in the same or similar communities under like circumstances. Mr. Ralph is familiar with that standard, and the court's ruling at this point is that he may give his opinion about it.

Finally, Mr. Ralph opines that attorney Jerry Levy had a duty to inform the plaintiff and Robert Levy if he determined that the statute of limitations had expired. Ralph states that Jerry Levy's failure to do so "precluded the opportunity, if any, for Mr. Berndt to mitigate his damages, if any, in advance of the filing of the motion for summary judgment" in the medical malpractice action. The undisputed facts show that Jerry Levy was asked by Robert Levy on or after October 31, 2002, to be co-counsel on plaintiff's claims against Dr. Kramer. By that time the statute of limitations had already expired, although neither attorney was then aware of it. Given this circumstance, the court agrees with plaintiff that Ralph's opinion concerning any duty Jerry Levy had to inform plaintiff about the statute of limitations is irrelevant to the instant claims. Given that Jerry Levy was brought in after the limitations period had already expired, his actions cannot be considered a proximate cause of the dismissal of plaintiff's medical malpractice claim. As for any assertion that his alleged failure to inform plaintiff about the statute of limitations deprived plaintiff of an opportunity to mitigate his damages by settling his claim before it was dismissed on summary judgment, such a contention is pure speculation on the current record. *Cf. McConwell v. FMG of Kansas City, Inc*., 18 Kan.App.2d 839, 861 P.2d

830 (1993) (evidence of possible settlement too speculative to support recovery).  In sum, the court concludes that plaintiff's motion to exclude the testimony of Bradley Ralph should be granted with respect to any opinions about the conduct of Jerry Levy.

B.  <u>Harry Bleeker</u>.

Plaintiff also moves pursuant to *Daubert* to exclude the testimony of attorney Harry Bleeker.  At the time of plaintiff's suit against Dr. Kramer, Mr. Bleeker was practicing law in Great Bend, Kansas.  Bleeker entered an appearance in the medical malpractice action on behalf of a client with a lien arising from workers' compensation benefits provided to plaintiff.  Defendant Robert Levy says Bleeker is a "non-retained expert who will provide opinions incidental to his knowledge and involvement in the underlying case, in much the same way a treating physician would."  Doc. 117 at 5.  Defendant argues that Bleeker is qualified by training and experience to express an expert opinion on the reasonableness of Robert Levy's conduct and to give his opinion that "the first date the statute [of limitations] would start to run would have been October 24th of 2000."  *Id*. at 7.

Plaintiff contends defendant has not shown that Mr. Bleeker is qualified to express such opinions.  Moreover, plaintiff argues that defendant failed to properly disclose or establish the witness' qualifications and the substance and bases of his opinions.  Plaintiff disputes that Mr. Bleeker expressed any opinion in his deposition about whether Robert Levy's conduct met the applicable standard of care.   Plaintiff also contends that Mr. Bleeker's opinion that the statute of limitations presented an issue of fact for a jury in the medical malpractice case is contrary to the law of the case and res judicata, because the Tenth Circuit determined that the issue was properly decided on summary judgment.

The confusion in the briefs as to exactly what expert opinions Mr. Bleeker would offer is underscored by defendant's inadequate disclosures concerning the witness and is reflected in the witness's deposition testimony.  As plaintiff points out, Mr. Bleeker did not offer any opinion in his deposition that Robert Levy's conduct met the applicable standard of care.  He did testify that when he first read the motion for summary judgment in the medical malpractice case, he did not think it had any merit.  He considered the statute of limitations issue to be a jury question and believed it "extremely unlikely" that the court would grant summary judgment on that issue.  When asked to explain why, Mr. Bleeker said "the evidence in terms of when Mr. Berndt knew or should have known that he had a malpractice claim against Dr. Kramer was very uncertain.  And as I looked at the facts, the – in my opinion, the first date that the statute would start to run would have been October 24th of 2000."  Doc. 117-1 at 52.  He said October 24th was "the first time that anybody, to my knowledge, told Mr. Berndt that he had the possibility of losing his leg."  *Id*. at 53.  When asked if that opinion would be incorrect if someone had told Mr. Berndt before October 24 that he had a serious, permanent infection, Mr. Bleeker replied: "No, because that's not what I was talking about.  I wasn't talking about the fact that he had an infection.  I think it's clear that he knew he had an infection, but he didn't know that the infection – what the effect of the infection was and I don't – I didn't see any evidence that he knew it was permanent."  *Id*. at 54.  Mr. Bleeker was not familiar with the contents of Dr. Kramer's operative report or with Dr. Gilbert's September 1, 2000 medical record, and he did not know what medical records Robert Levy reviewed prior to filing suit.  *Id*. at 55-57.

The court concludes that the motion to exclude Mr. Bleeker's opinion testimony should be granted.  Nowhere in the cited deposition testimony did Mr. Bleeker express any opinion on

the applicable standard of care for an attorney in Robert Levy's circumstances, nor did he express any opinion as to whether Robert Levy met the applicable standard of care. Mr. Bleeker was not asked to and did not offer any such opinions. In fact, he really did not offer expert opinions at all; he simply explained the basis for his own belief that the limitations argument made by Dr. Kramer was not likely to prevail. That belief, of course, turned out to be contrary to the court's subsequent ruling. Defendant argues that Mr. Bleeker's testimony should be admitted as an opinion "that a reasonable attorney under the circumstances would have reached." Defendant's argument appears to be an attempt to rely on the principle of law that "an attorney is not liable for an error in judgment on points of ... doubtful construction, or for a mistaken opinion on a point of law that has not been settled by a court of last resort and on which reasonable doubt may well be entertained by informed lawyers." *See Bergstrom v. Noah*, 266 Kan. 847, 879-80, 974 P.2d 531 (quoting 7 Am.Jur.2d, Attorneys At Law § 221).[2] But as noted above, Mr. Bleeker offered no opinion on the applicable standard of care, nor did he testify that the law was so unsettled that reasonable, well-informed attorneys could disagree on its application. The court will not construe his testimony to say something it does not say. Moreover, it is clear from the deposition testimony that Mr. Bleeker's opinion was based in part on an erroneous factual premise – contrary to his understanding, there was evidence that plaintiff knew his infection was permanent as of October 1, 2000.

The proponent of expert testimony "has the burden of establishing that the pertinent

---

[2] The "error in law" defense is "a narrow one and should not be employed where the issue is settled and can be identified through ordinary research and investigative techniques,..." It applies "where the law is unclear, unsettled by case law, and is an issue ... upon which reasonable doubt may well be entertained by informed counsel." *Bergstrom*, 266 Kan. at 880.

admissibility requirements are met by a preponderance of the evidence." Fed.R.Evid. 702 advisory committee's note, 2000 Amendments ¶ 1. Defendant has not met that burden; accordingly the plaintiff's motion to exclude Mr. Bleeker's testimony is granted.

C.  Ed Gormanson.

Ed Gormanson is a certified prosthetist who designs and fits artificial limbs for amputees. He was retained by the defendant to render an opinion on the types of activities an individual of plaintiff's age and health would be able to engage in through the use of a prosthetic leg, absent other physical limitations. His opinion is that such a hypothetical individual "would be able to wear his prosthesis from the time he woke up to the time he went to bed," and "would be capable of carrying up to 50 pounds, climbing stairs with some limitations, bending and stooping without limitation, and squatting occasionally." Defendant "intends to offer this expert testimony to assist the jury in distinguishing the functional tasks that Plaintiff cannot perform because of his amputation compared to those he may not be able to perform because of other health problems." Doc. 133 at 4. Plaintiff argues that Gormanson's testimony should be excluded because defendant has not shown that Gormanson has the qualifications to express such opinions, because his opinions invade the province of medical science, and because his opinions are based on speculative assumptions rather than the facts of the case.

Mr. Gormanson has worked as a prosthetist for over 36 years. His work entails designing and fitting artificial limbs for amputees. He is certified by the American Board for Certification in Orthotics and Prosthetics. He maintains his certification by attending a required number of continuing education classes. The record indicates that although he does not possess a college degree or advanced degree in this field, he has practical expertise in designing, fitting and

altering prosthetic devices for amputees in order to allow such individuals to maximize their functional capacities. The determination of whether a prosthetic device is medically advisable for an individual requires a determination by a physician; Mr. Gormanson cannot make and fit a prosthesis without a physician's prescription. Part of his job is to make recommendations to physicians about which type of component would work best for a particular patient. His work necessarily involves some specialized knowledge of the performance and characteristics of particular prosthetic devices as well as, presumably, their limitations. In his deposition, Mr. Gormanson stated that he was "providing testimony as to what a below-knee amputee can and cannot do." Doc. 133-1 at 2. Defendant has not explained how Mr. Gormanson arrived at his opinion that an amputee of Mr. Berndt's age would, without other limitations, be capable of lifting 50 pounds or performing other specific activities. Mr. Gormanson did not examine the plaintiff and does not purport to offer an opinion as to the plaintiff's particular condition or abilities.

Based on the record before it, the court will grant the motion to exclude this witness's testimony. "Whether an expert's knowledge will 'assist the trier of fact' is primarily a question of relevance." *S.V. v. Midwest Coast Transport, Inc.*, 2004 WL 3486464 (D.Kan., Jan. 2, 2004) (*citing Daubert*, 509 U.S. at 591). "An expert's knowledge may be of assistance where properly applied, but if forced into service were it does not 'fit,' it may not be helpful at all." *Id*. Mr. Gormanson's expertise lies in the area of recommending, designing, and fitting appropriate prosthetic devices. The court has no doubt that he has specialized knowledge in the characteristics and functions of prosthetic devices and in assessing what devices are best suited to individuals with particular functional abilities. But a determination of the extent of Mr.

Berndt's particular physical limitations would require an assessment of him by a medical professional trained to make such assessments. No showing has been made that Mr. Gormanson undertook such an inquiry or that he has such expertise. And whether any of Mr. Berndt's particular physical limitations are caused in whole or in part by his amputation, or whether instead they are due to other, unrelated health conditions, is a matter that requires the expertise and assessment of a physician. For example, the question of whether Mr. Berndt's allegedly "severe arthritis in his non-amputated foot, which prevents him from standing for more than a short period of time" (Doc. 133 at 3) is a condition that is caused *or aggravated by* his amputation and use of a prosthesis is a question that requires an examination and assessment by a physician. Defendant has not shown that Mr. Gormanson has the expertise to make an assessment of Mr. Berndt's physical limitations or whether those limitations are caused in whole or in part by the amputation of his leg or some other cause. Defendant apparently intends to use Mr. Gormanson's testimony to suggest such inferences; plaintiff aptly characterizes this as a "back door" attempt to prove a medical issue. The court believes this is an instance of attempting to force the witness's expertise into area where it does not fit. Defendant has not met his burden of showing that the witness's expert opinion testimony is admissible under *Daubert*.

    D. <u>Bud Langston</u>. Defendant has retained a vocational expert, Bud Langston, to render an opinion about Mr. Berndt's employment potential. Langston opined that plaintiff could engage in sedentary work and also in a partial range of light or medium exertion level jobs. He further opined that given plaintiff's background and his residual functional capacity, he could earn from $7 to $9 per hour in such work. Plaintiff does not directly challenge Langston's qualifications, but contends his opinions are not supported by competent, reliable evidence.

Doc. 123 at 1.  Among other things, plaintiff complains that Langston based his opinion on an outdated evaluation and that he relied upon the unsupported opinions of Mr. Gormanson.

The record, including Mr. Langston's deposition testimony, shows that he based his opinion of plaintiff's vocational abilities in part on plaintiff's restrictions and limitations noted in previous medical evaluations.  He said he relied in part upon medical evaluations performed by Dr. Hufford in 2009 and Dr. Baughman in 2002.  Plaintiff challenges the use of the 2002 evaluation, but Langston explained in his deposition why that evaluation was considered, and the court concludes that his reliance upon it goes to the weight rather than the admissibility of his testimony.  Plaintiff also challenges Langston's reliance upon opinions of Bud Gormanson, which the court has now ruled inadmissible, but the deposition testimony indicates that Langston may have relied only upon the physicians' evaluations in determining plaintiff's functional capacity.  Langston recognized that Gormanson's opinions were based upon records rather than an examination and that Gormanson did not consider any disabling conditions other than plaintiff's below-the-knee amputation.  Doc. 132 at 11 (Depo. Pp. 43-44).  While Gormanson's opinions should be excluded for the above reasons stated by the court, those opinions were largely peripheral to Langston's conclusions about plaintiff's vocational abilities.  The court concludes that the motion to exclude Langston's testimony should be denied.  As the Court noted in *Daubert*, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  *Daubert*, 509 U.S. at 596.

**III.** ***Plaintiff's Motion for Summary Judgment***.

Plaintiff next moves for partial summary judgment.  He contends he is entitled to

judgment as a matter of law on issues of Jerry Levy's comparative fault, on the issue of comparative fault generally, and on the issue of Dr. Kramer's departure from the standard of care in the underlying medical malpractice action.

_Uncontroverted Facts_.  For purposes of the instant motion, the court finds the following facts to be uncontroverted.  To the extent the record shows a genuine dispute of fact, the court adopts the non-movant (defendant's) version of the facts in keeping with the standards governing summary judgment.

1.  Plaintiff contends that Defendant Levy was negligent by departing from the standard of care in his investigation and representation of Plaintiff and by failing to timely file Plaintiff's medical malpractice action against Dr. Gary Kramer within the applicable statute of limitations. (PLAINTIFF'S COMPLAINT, ¶¶ 16-20. (Dkt 1)).

2. In Defendant Levy's Answer:

a. He admitted the existence of an attorney client relationship between Plaintiff Berndt and Defendant Levy at all material times. (DEFENDANT'S ANSWER ¶ 4 (Dkt 2)).

b. He alleged the affirmative defense of comparative fault of Plaintiff and "other persons". (DEFENDANT'S ANSWER, ¶ 22. (Dkt 2)).

3.  Mr. Berndt's wife first contacted Robert Levy's office in the first part of September 2001.  An interoffice memo was generated by Mr. Levy's office staff on September 11, 2001, when Mr. Berndt's wife again contacted Mr. Levy's office. (Exhibit 1; Robert Levy Deposition; pg. 87:22 to pg. 88:14).

a. The memo notes: "has had 5 surgeries"; Mr. Berndt "got staff like infection and ultimately lost his leg . . . also had ear damage from medication he was on." (Exhibit 2; 9/11/01

memo).

b. At some point in time, Robert Levy made handwritten notations on a copy of the September 11, 2001 memo, including that Plaintiff Berndt had seen Amelia (at Hanger Prosthetics); that Plaintiff Berndt had seen Dr. Shields, Dr. Baughman, and Dr. Peterie. (Exhibit 3; 9/11/01 memo with notations; Exhibit 1; Robert Levy Depostion; pg. 65:1-13).

c. The first time Mr. Berndt talked with Robert Levy, Mr. Berndt had a suspicion of malpractice relating to Mr. Berndt's ear problems. (Exhibit 1; Robert Levy Deposition; pg. 177: 3-11).

4. Frederick Berndt received legal services from Robert Levy on September 14, 2001, when Defendant Levy called Ed Gormanson at Hanger Prosthetics about Mr. Berndt's prosthetic leg. (Exhibit 4; Medical Records; 001447; Exhibit 5; Ed Gormanson Deposition; pg. 32:13 to pg. 33:22).

5. On May 14, 2002, Defendant Levy wrote a letter to Plaintiff Berndt stating, "Pertaining to the probable permanent ear damage (as a result of extended use of medication), I will obtain the medical records to evaluate same." (Exhibit 6; Letter of 5/14/02 from Defendant Levy to Plaintiff Berndt).

6. Also, on May 14, 2002, Defendant Levy wrote a letter stating, "Due to concerns over his medical care in Garden City . . . " (Exhibit 7; Letter of 5/14/02).

7. On October 24, 2002, Robert Levy filed a request to convene a Medical Malpractice Screening Panel in Finney County, Kansas on behalf of Mr. Berndt against Dr. Gary Kramer and the Garden Medical Clinic. (Exhibit 8; Defendant's response to Plaintiff's first RFA, No. 17).

8. On November 4, 2002, Defendant Levy wrote a letter to Gary Austerman, defense

counsel for Dr. Gary Kramer, the physician in the medical malpractice action, stating: "On October 24, 2002, I filed a Petition/Memorandum for a screening panel . . . The claim is for events from June, 2000 through October 23, 2000." (Exhibit 9; Letter of 11/4/02 to Gary Austerman).

9.  On November 4, 2002, Defendant Levy also forwarded a letter to Jerry Levy stating, "I faxed you an October 24, 2000 medical record for your review and to confirm my opinion . . . Last summer, and while I did not have the October 24, 2000 report (from Dr. Peterie), I had a strong suspicion of medical malpractice . . . As I do not trust the work comp carrier to have a complete file, my office has formally requested a complete set of medical records and medical bills from each provider". (Exhibit 10; 11/4/02 letter to Jerry Levy).

10.  On August 5, 2003, Robert Levy filed a civil action in the United States District Court, District of Kansas, on behalf of Mr. Berndt against Dr. Gary Kramer. (Exhibit 8; Defendant's Response to Plaintiff's First RFA, No. 19).

a.  Among other allegations, the complaint alleged that Dr. Kramer was negligent, careless and deviated from standard approved medical care and treatment in his performance, evaluation, diagnosis, monitoring and other care including, but not limited to: using negligent and sub-standard techniques, methods and skills and failing to timely refer or consult a specialist. (Dkt #1, Case No. 03-1283, JTM).  Judge Marten subsequently dismissed these claims based on the applicable 2-year statute of limitations.

11.  On September 18, 2007, the Tenth Circuit Court of Appeals ruled that on September 1, 2000, Plaintiff Berndt's injury was "reasonably ascertainable" and Plaintiff had reason to know his injury was permanent. Therefore, the Court ruled the statute of limitations began to run

on September 1, 2000. "Once plaintiff's injury was reasonably ascertainable, the plaintiff has a duty to investigate whether negligence caused the injury." Mr. Berndt's claims against Dr. Kramer for his right leg amputation were thus found to be barred by the statute of limitations because the action was not filed until October 24, 2002. *Berndt v. Kramer*, 249 Fed. Appx. 45 (10th Cir. 2007).

12. A handwritten note, dated November 5, 2007, from the Bar Plan's file (Defendant Levy's legal malpractice insurance carrier), states:

Insured was retained to handle work comp case & agreed to investigate the ear damage claim – the ear damage claim was filed timely & was settled - the amputation was deemed to carry an earlier SOL which expired before Mr. Levy filed the claim (re: the ear) with the med mal review panel. Levy says he did not know about other possible theories until he rec'd additional records in Oct."

(Exhibit 11; Bar Plan handwritten note)(emphasis added).

B. Facts Relating to Defendant Levy's Alleged Fault in the Legal Malpractice Action:

13-18. Omitted. See court's discussion of motions in limine, supra.

19. Plaintiff's legal expert, Mike Sexton produced written reports on December 19, 2008 and August 3, 2009 (Exhibit 16). Mr. Sexton was deposed on March 25, 2009. (Exhibit 17). Mr. Sexton has opined that Mr. Levy was negligent in his investigation and evaluation into Mr. Berndt's claims; and that Mr. Levy was negligent in failing to file either a lawsuit or a request for a medical malpractice screening panel prior to the expiration of the statute of limitations date on September 1, 2002. (Exhibit 16; Sexton report dated 12/19/08).

20. Defendant Levy was deposed on October 29, 2008. (Exhibit 1; Robert Levy

Deposition). In his deposition, Defendant Levy testified:

a. The Standard of Care requires every case be filed within the statute of limitations. (Exhibit 1; pg. 81:12-17)(emphasis added).

b. Mr. Levy does not have a detailed independent recollection of the first client encounter meeting with the Berndts. (Exhibit 1; pg. 53:2-10).

c. Mr. Levy claims Mr. Berndt never told him about Dr. Gilbert's statement of September 1, 2000 that the infection was likely permanent and he would take it to his grave. (Exhibit 1; pg. 153:1-10).

d. To investigate the cause of Mr. Berndt's infection, defendant Levy talked to Guy, requested medical records from Garden Medical Clinic and Dr. Peterie, and talked to Dr. Naomi Shields in Wichita in the summer of 2002. (Exhibit 1; pg. 89:8 to pg. 90:1). He also did some online research and may have talked to a nurse.

e. Prior to filing the Medical Malpractice Screening Panel, Mr. Levy did not have records from St. Catherine's Hospital, but he believes he had Dr. John Gilbert's medical records. (Exhibit 1; pg. 93:17 to pg. 94:11).

f. Defendant Levy recalls reviewing Dr. Gilbert's medical records and looking up the word "tenacious". He reviewed the records in the summer of 2002. (Exhibit 1; pg. 104:17-21; pg. 105:15-24).

i. Mr. Levy learned the word tenacious meant something that's very difficult to treat, difficult to get rid of. (Exhibit 1; pg. 105:3-14).

ii. Mr. Levy remembers looking up the word in the context of talking to Guy and reviewing Dr. Gilbert's medical record in the summer of 2002. (Exhibit 1; pg. 105:12-20).

g. Robert Levy conceded that the information in Dr. Gilbert's medical record from 9/1/00 on Mr. Berndt indicates possible medical malpractice on Dr. Kramer's part. (Exhibit 1; pg. 111:2-14).

h. Defendant Levy did not consult an orthopedic expert after his review of Mr. Berndt's records from Dr. Gilbert to verify if Dr. Gilbert's finding that the bone graft, placed by Dr. Kramer during his surgery, being gone was malpractice. Mr. Levy agreed this would be his job "if [it were] necessary." (Exhibit 1; pg. 111:15-24; errata).

i. Mr. Levy agrees that if plaintiff's surgery flopped because of Dr. Kramer's actions, the Statute of Limitations ran before October 23, 2002. (Exhibit 1; pg. 111: 8-12).

j. Mr. Levy agrees that if he had reviewed Dr. Gilbert's note thoroughly, then, with what the Tenth Circuit decided, the "best practice" would have been to file the screening panel way before 10/23/02. (Exhibit 1; pg. 111:19 to pg. 112:1).

k. Mr. Levy agrees there "could be" enough information in Dr. Gilbert's note of 9/1/00 to put him on notice of a potential medical malpractice claim against Dr. Kramer for which the SOL ran prior to September 1, 2002. (Exhibit 1; pg. 115:10-20).

l. Mr. Levy agrees the Berndts had a right to rely that he knew when the SOL ran on their claims. (Exhibit 1; pg. 115:25 to pg. 116:4).

m. Controverted. Plaintiff contends defendant admitted that any comment by plaintiff about "taking the infection to the grave" would have been immaterial to him in view of Dr. Gilbert's records. See Doc. 124-3, pg. 116:19 to pg. 117:9. But as defendant points out, the responses quoted came after compound questions by plaintiff's counsel, making it impossible to tell which question the witness was actually answering. Moreover, defendant subsequently

denied the immateriality of that information. *Id.*, P. 118:12-15. For purposes of the instant

motion, the court does not find that defendant made such an admission.

n. Defendant conceded in his deposition that lawyers cannot assume their clients know

what information is documented in their medical records; that lawyers can't assume their clients

know medicine; that lawyers can't assume their clients know the law; and that clients don't

always know what is important in their case. (Exhibit 1; pg. 136:23 to pg. 137:8; pg. 153:14-19).

o. The Berndts talked to Robert Levy about Dr. Gilbert's care and treatment of Mr.

Berndt in the first meeting they had with Mr. Levy. (Exhibit 1; pg. 152:8-10; pg. 233:22 to pg.

234:1).

i. Mr. Levy knew the infection from day one was serious, the first discussion he

had with the Berndts. (Exhibit 1; pg. 233:22 to pg. 234:9).

ii. Mr. Levy never had a verbal conversation with Dr. Gilbert or Dr. Peterie about

Mr. Berndt. (Exhibit 1; pg. 255:6-12).

p. Mr. Berndt had a suspicion of malpractice the first time he talked to Mr. Levy,

relating to the ringing in his ears. (Exhibit 1; pg. 177:3-7).

q. Mr. Levy had a reasonable suspicion of malpractice prior to Mr. Berndt telling him

about black pus squirting out of his wound. Two years from the date of that incident was well

before Robert Levy filed the screening panel action. (Exhibit 1; pg. 181:6-13; Doc. 124-16, p. 4.)

r. Controverted.

s. Mr. Levy does not recall when he first learned that Dr. Kramer did surgery in the face

of fracture blisters, but said it would have been well before August 2003. Doc. 108-1 p. 212:4-

14. (Plaintiff has not shown that the remainder of this assertion of fact is uncontroverted.).

t. Controverted. Plaintiff has not shown that the factual premise of the question is uncontroverted.

Facts Relating to Defendant Levy's Affirmative Defenses of Comparative Fault.

21. On September 30, 2008, Defendant Levy produced his notification of the identification of comparative fault. Regarding the legal malpractice action, Defendant Levy identified the Plaintiff, Frederick Berndt, as being comparatively at fault in the legal malpractice action and the medical malpractice action. In the Medical Malpractice action, Defendant also identified Stanton County Hospital and St. Catherine's Hospital. (Dkt. 15).

22. On January 26, 2009, Defendant Robert Levy produced his Amended Comparative Fault Identification, wherein he alleged the following individuals were comparatively at fault in the legal malpractice action: Guy Berndt, Janice Berndt (Plaintiff's wife); Jerry Levy (co-counsel in the medical malpractice action as of November 1, 2002); Dana Reese Frazier, Candy Wright, EMC and/or its agents, assigns, attorneys and/or employees (workman compensation carrier and its employees and agents); and

a. Defendant Levy alleged the following were comparatively at fault in the underlying medical malpractice action: Plaintiff Guy Berndt "as it relates to Plaintiff's role and decisions in his course and direction of treatment"; Stanton County Hospital and St. Catherine's Hospital. (Dkt 31).

23. Dr. John Gilbert's medical record of September 1, 2000 includes the following:

"The wound has seemed to subside with the current IV regimen, which consists of Tobramycin three times a day. Examination shows a swollen erythematous appearing foot with a healing surgical incision in the posterior aspect of the lateral heel. The distal arm appears to be

well healed, and has retained sutures. The superior arm appears to be healing, which has had no drainage overnight on inspection of the gauze pad today. * * * Follow-up films here today show good maintenance of the architecture of the os calcis as obtained intraoperatively. Most of the bone graft appears to be absent at this point. There would appear to be tenuous union... The nature and rather guarded prognosis were discussed at some length with the patient and his wife . . . The tenacious nature of a deep-seated bony infection was discussed. The guarded prognosis for the function of the foot, the likelihood of subtalar arthritis, the pros and cons of attempting a fusion at a later date, as well as the risks and possible benefits were likewise discussed . . ." (Exhibit 4; Medical Record 000878).

    a.  Defendant Levy claims that he had Dr. Kramer's medical records prior to September 1, 2002. (Exhibit 1; pg. 90:10-13; pg. 93:1-16: pg. 138:9-16).

<u>Facts Related to Defendant's Claim of Plaintiff's Comparative Fault in the Legal Malpractice Case</u>:

25.  Defendant Levy asserts that Plaintiff is comparatively at fault in the legal malpractice action, in the following particulars:

    a.  Failing to inform Defendant that he believed that his infection was permanent and serious prior to Defendant filing the medical malpractice screening panel on October 24, 2002;

    b.  Failing to inform Defendant that Dr. John Gilbert told Plaintiff that he would likely take his infection to his grave prior to Defendant's filing of the medical malpractice screening panel on October 24, 2002.

26.  The only expert testimony Defendant Levy has produced regarding Plaintiff

Frederick "Guy" Berndt's comparative fault is that of Brad Ralph.

27. Omitted. See court's ruling on *Daubert* motion, supra.

28. *Id*.

29. On August 29, 2008, Defendant Levy provided verified responses to Plaintiff's First Set of Interrogatories. Therein, Defendant Levy was requested to provide information relating to his first client encounter meeting with Mr. Berndt. In response, Defendant Levy indicated he had no recall as to the date and time of the meeting and he had no specific or independent recollection of the meeting. "However, I believe the general discussion focused on Guy Berndt's accident, medical care by Kramer, Gilbert, Petrie, Shields and his specific needs at the time." (Exhibit 19; Defendant's Response to First Set of Interrogatories, No. 8) (emphasis added).

30. Defendant Levy testified that during his first client encounter meeting with the Berndts, the Berndts had a general discussion with him concerning Dr. Gilbert's care and treatment. (Exhibit 1; pg. 233:22 to pg. 234:1).

31. (Duplicates previous statement #20, l & n..)

32. (Duplicates previous statements).

33. a. Dr. Gilbert's definition of "tenacious" is "hard to get rid of and it can last a long time." (Exhibit 20; pg. 76:4-6).

    b. Dr. Gilbert's belief as to what a person would conclude from reading his report is irrelevant.

34. Plaintiff states in an affidavit that he told Robert Levy during one of their first meetings about Dr. Gilbert's findings that his infection was serious, severe and permanent, and that he would take the infection to the grave. Defendant has provided contrary evidence,

however, and for purposes of plaintiff's motion for summary judgment the court views the evidence in the light favorable to the defendant.

Facts Related to Defendant's Claim of Jerry Levy's Comparative Fault in the Legal Malpractice Case.

35. Defendant Levy claims that Jerry Levy was comparatively at fault in the Legal Malpractice portion of this lawsuit in the following manners:

a. Failed to inform Defendant that he believed Defendant missed the Statute of Limitations at the time Jerry Levy developed such a belief or at any time thereafter.

b. Failure to inform Plaintiff of his belief that Defendant had missed the Statute of Limitations at the time Jerry Levy developed such a belief or at any time thereafter.

c. Failure to take actions to mitigate Plaintiff's damages and to settle Plaintiff's case against Dr. Kramer for the maximum amount possible prior to the filing of the Motion for Summary Judgment, the ruling on the Motion for Summary Judgment, and/or at any time in the case. See Doc. 31.

36. Jerry Levy was formally contacted to consult and be co-counsel with Defendant Robert Levy on Plaintiff's medical malpractice claim against Dr. Gary Kramer on November 1, 2002. (Exhibit 22; Jerry Levy Case Intake Form).

Sometime in the summer of 2002, Jerry Levy was in Robert Levy's office in Garden City, when Robert mentioned the plaintiff's case against Dr. Kramer. Robert Levy said he was in the process of obtaining medical records and, once he got them, he would send them to Jerry to look over and see whether he thought there was a good case. Doc. 124-23, p. 43:9.

37. The only expert testimony Defendant Levy has to establish the standard of care

pertaining to his claim of comparative fault against Jerry Levy is that of Brad Ralph, which the court has now ruled inadmissible. (Exhibit 12; Defendant Levy's Designation of Expert Testimony).

38-40.  Not relevant in view of the court's ruling on Mr. Ralph's opinion testimony.

41.  Jerry Levy had no input into the filing of the Medical Malpractice Screening Panel. (Exhibit 23; pg. 32:9-12).

42.  Jerry Levy's client information form relating to Guy Berndt's case, dated November 1, 2002, is a form that Jerry Levy used to open a new file in his office. (Exhibit 23; pg. 15:20 to pg. 16:6, attaching deposition ex. 1).

　　a.  On the form, "date the cause arose - 10/24/00" is information given to Jerry Levy by Robert Levy. "Statute of limitation expires - 10/24/02" is also information given to Jerry Levy by Robert Levy. (Exhibit 23; pg. 17:24 to pg. 18:9).

43.  Jerry Levy was not involved in calculating the statute of limitations date on Mr. Berndt's claims against Dr. Kramer; he did not have any input with Robert Levy in requesting the screening panel. (Exhibit 23; pg. 32:9-12).

　　a.  The first documentation of Defendant Robert Levy consulting Jerry Levy to assist with the Berndt v. Kramer medical malpractice case is on October 31, 2002, when he forwarded a fax transmission to Jerry Levy regarding Mr. Berndt. (Exhibit 24; 10/31/02 fax from Robert Levy to Jerry Levy).

　　b.  On November 1, 2002 Jerry Levy generated a "Client Information" intake form concerning Mr. Berndt's medical malpractice case. (Exhibit 22; 11/1/02 Client Intake Form). Jerry Levy testified that he was not involved in the Berndt Medical Malpractice action

until after the statute of limitations was determined to have expired by the Tenth Circuit (September 1, 2002). (Exhibit 23; pg. 14:23- pg. 15:1). As noted above, Jerry Levy and Robert Levy had talked in the summer of 2002 about Jerry Levy possibly consulting on the case.

      c. On November 4, 2002, Robert Levy forwarded Jerry Levy a letter concerning their professional arrangement in the Berndt v. Kramer matter. (Exhibit 10; 11/4/02 correspondence).

44. The court has granted the motion to exclude the testimony of Brad Ralph insofar as it pertains to Jerry Levy's conduct.

<u>Facts Related to Defendant's Claim of Plaintiff Frederick Berndt's Comparative Fault in the Medical Malpractice Case</u>:

45. Defendant Levy claims that Plaintiff, Frederick "Guy" Berndt, was comparatively at fault in the medical malpractice portion of this lawsuit in the following manners:

      a. Failed to notify hospital personnel and/or complain that he had not been properly cleaned;

      b. Failed to notify hospital personnel and/or complain that his sheets had not been changed;

      c. Failed to take steps to cleanse himself while he was in the hospital;

      d. Failed to avoid locations and activities that would subject himself to increased risk of contracting an infection, such as going camping shortly after undergoing the surgical repair to his right calcaneous;

      e. Going against the advice of his physicians and refusing to stop smoking despite the increased likelihood of an unsuccessful surgical result, increased risk of post-surgical infection

and increased difficulty in eradicating the infection;

f. Making the decision to return to the care and treatment of Dr. Gary Kramer after such time that Mr. Berndt had been informed that Dr. Gary Kramer had mis-prescribed Tobramycin; and

g. Electing from among reasonable alternatives to have his right leg amputated below the knee, as opposed to pursuing more conservative options.

46. In Defendant Levy's Amended Designation of Comparative Fault, Defendant Levy identified Plaintiff Berndt being comparatively at fault in the medical malpractice action as follows: "Defendant Levy alleges the following are comparatively at fault in the underlying medical malpractice action: Plaintiff Guy Berndt as it relates to Plaintiff's role and decisions in his course and direction of treatment . . ." (Dkt 31, Defendant Levy's Amended Designation of Comparative Fault).

47. Defendant has cited expert medical opinion evidence from which a reasonable jury could conclude that Dr. Kramer's alleged negligence was not the cause of some or all of plaintiff's damages. Dr. Hinthorn provided a report indicating that if Dr. Kramer cleaned the area well and avoided the fracture blisters when operating on plaintiff's foot, as Kramer testified, then it is unlikely that the pseudomonas infection in plaintiff's foot was due to the surgery, and it was quite likely that Mr. Berndt contracted the organism when the surgical site was draining and became wet. Additionally, he said, the fact that plaintiff was a smoker increased the likelihood of failure of the surgical procedure and increased the likelihood of infection, due to diminished blood supply to the lower extremities from smoking. Doc. 124-17. This testimony could be a basis for a jury to find that Dr. Kramer's alleged negligence was not the cause of plaintiff's

injuries.  Additionally, defendant cites testimony by Dr. Shields that she discussed treatment options with plaintiff and that plaintiff "was unwilling to give up cigarette smoking" although smoking presented a risk of complications for surgery.  Doc. 124-26, 11:1-12:12; 14:14.

48.  Although plaintiff contends he was never instructed by any health care provider prior to March 2001 (the date of his amputation) that smoking would in any way effect his infection or contribute to poor wound healing, the testimony noted above by Dr. Shields gives rise to a reasonable inference that she discussed this matter with plaintiff in February 2001, prior to the amputation.

Plaintiff cites evidence that Dr. Kramer had no issue with his smoking and never told him that it would inhibit the healing process.  Defendant cites no evidence to controvert this testimony.

49.  Plaintiff signed informed consent documents prior to surgery which stated that the various risks of surgery had been discussed with him.  There is no notation in his records specifically stating that he had been instructed by a health care provider that smoking could contribute to an infection or inhibit the healing process.

50.  Plaintiff has cited evidence that prior to going on vacation to Colorado in July 2000, after his surgery by Dr. Kramer, he discussed this with Dr. Kramer and Dr. Kramer specifically gave him permission to do so, as long has he kept his leg elevated. During his vacation, Mr. Berndt testified that he did keep his leg elevated, as instructed by Dr. Kramer. (Exhibit 21; Frederick Berndt Affidavit).

51.  On June 19, 2000, Dana Reese Frazier documented: "On 6/22/00, I placed a phone call to the claimant and spoke with him and his wife.  According to Mrs. Berndt, they are leaving

for vacation the following day to spend the 4th in Colorado. She stated the physician gave them permission to do so, as long as her husband keeps his leg elevated and does not do any driving or activity other than rest with elevation of the leg. She informed me the physician, as well as the medical staff, has taught her how to care for his dressing and she does feel comfortable in doing that." (Exhibit 26; Case Note of 6/19/00).

52. Dr. Naomi Shields, an orthopedic surgeon saw Plaintiff on February 12, 2001. At this time, Dr. Shields documented: "He would like to get on with his life and I have strongly recommended he consider below the knee amputation with immediate post op prosthesis." (Exhibit 4; Medical Record, 000832).

    a. On Mr. Berndt's Patient History form from Dr. Shield's office, it notes: "Dr. Krammer (sic) feels like best decision is to amputate". (Exhibit 4; Medical Record 000836).

Facts Related to Defendant's Claim of Plaintiff's Spouse's (Janice Berndt's) Comparative Fault in the Medical Malpractice Case:

53. Defendant Levy claims Plaintiff's spouse, Janice Berndt, was comparatively at fault in the medical malpractice action, in the following ways:

    a. Janice Berndt undertook a duty to care for Mr. Berndt's wound site when she agreed to change the bandages thereon.

    b. Janice Berndt failed to ensure proper sanitation and cleanliness in the changing of Mr. Berndt's wound site dressing.

54. In Defendant Levy's Amended Designation of Comparative Fault, Defendant Levy identified Plaintiff's spouse, Janice Berndt, as being comparatively at fault in the medical malpractice action as follows: "as it relates to communications with Defendant including but not

limited to plaintiff's medical condition, treatment and information provided by various healthcare providers." (Dkt 31, Defendant Levy's Amended Designation of Comparative Fault).

55.  There is no expert testimony from any witness that Plaintiff's spouse, Janice Berndt, was negligent in any of the manners specified by Defendant Levy.  There is expert medical testimony from Dr. Peterie that changing dressings and following wound care instructions is critical to minimizing infection.

<u>Facts Related to Defendant's Claim of St. Catherine's Hospital's Comparative Fault in the Medical Malpractice Case.</u>

56.  Defendant asserts that St. Catherine's Hospital (the hospital where Dr. Kramer performed Plaintiff's surgery) was comparatively at fault for Plaintiff's injuries in the medical malpractice action in the following manners:

a.  Failed to properly cleanse Mr. Berndt upon his admission to the hospital;

b.  Failed to bathe Mr. Berndt to cleanse him during his stay at the hospital

c.  Failed to change Mr. Berndt's sheets during the time he stayed at the hospital;

d.  Allowed Mr. Berndt to lay in a bed filled with dirt and/or landfill debris during his stay at the hospital.

57.  In Defendant Levy's Amended Designation of Comparative Fault, Defendant Levy identified St. Catherine's Hospital as being comparatively at fault in the medical malpractice action as follows: "Defendant may also compare the fault of Stanton County Hospital and St. Catherine Hospital in the medical malpractice case based upon their role in Plaintiff's medical care. (Dkt 31, Defendant Levy's Amended Designation of Comparative Fault).

58.  There is no expert testimony from any witness that St. Catherine's Hospital was

negligent in any of the manners specified by Defendant Levy in the Pretrial Order (see Statement of Fact 56, supra).

Defendant attempts to controvert this assertion, but the evidence he cites contains no expert opinion testimony establishing that a lack of due care by the hospital caused or contributed to plaintiff's injuries.

Facts Relating to Dr. Kramer's Alleged Departure from Standard of Care in the Underlying Medical Malpractice Action:

59.  On April 12, 2004, Dr. Kramer, the Defendant physician in the underlying medical malpractice action, testified that but for the infection that Mr. Berndt developed, Dr. Kramer did not think Mr. Berndt would have required an amputation. (Exhibit 27; pg. 189:23 to pg. 190:6; and pg. 190:16-24).  (Dr. Kramer will not testify at trial as he died on February 3, 2008).

Defendant cites expert medical opinion of Dr. Horton that poor outcomes "are extremely likely" for fractures of the severity suffered by plaintiff, a matter further complicated by the fact that plaintiff was a smoker.  He said "there is a recognized incidence of amputation" with the type of severe injury plaintiff sustained whether or not the surgery is considered successful. Doc. 124-15.

60.  On June 24, 2004, Dr. Gary Kramer admitted, pursuant to a formal Request for Admission, that "the plaintiff's infection was a factor that was considered in the decision to amputate his foot". (Exhibit 28; Defendant Kramer's Responses to Plaintiff's First Request for Admission to Defendant, No. 7).

61.  Steve Brave of Klenda, Mitchell, Austerman and Zurcher, was one of Dr. Kramer's defense attorneys in the underlying medical malpractice action, Case No. 03-1283-JTM. (Exhibit

29; pg. 5:16-23).

62. Mr. Brave was deposed on December 18, 2008. (Exhibit 29; Brave Deposition).

63. Mr. Brave testified that from day one in the medical malpractice action, the statute of limitation defense was on the defense radar. (Exhibit 29; pg. 61:16-20); and at the time Dr. Kramer filed his motion for summary judgment on the statute of limitations, and after Mr. Berndt's deposition testimony, the statute of limitations "was the radar. That was the defense." (Id, at 62:18-21).

64. Mr. Brave's testimony about what he might (hypothetically) have recommended in the medical malpractice litigation has not been shown to be material.

**Defendant's Statement of Additional Facts**.

1. Defendant engaged in a variety of activities to investigate Plaintiff's claim, including but not limited to:

a. Asking Plaintiff's wife Janice Berndt to create a calendar and journal to document Plaintiff's past and future medical care and treatment (J. Berndt Dep. 30:21-31:13, Exhibit 1);

b. Asking Plaintiff a variety of questions relating to his care and treatment by a variety of medical providers ®. Levy Dep. 151:17-153:10, Exhibit 2; F. Berndt Dep. 193:9-15, Exhibit 20).

c. [omitted]

d. Speaking to Dr. Naomi Shields, a nurse, and reviewing Plaintiff's records, including those from Garden City Medical Clinic, Dr. Kramer, Dr. Gilbert, Dr. Peterie and other records received from the workers compensation carrier. ®. Levy Dep. 89:5-14, 93:22-94:11; 96:8-13, Exhibit 2).

e.  Conducting his own medical research relating to Plaintiff's injury,

care and treatment. ®. Levy Dep. 90:10-91:14, Exhibit 2).

2.  Defendant determined the statute of limitations on Plaintiff's claim began to run on

October 24, 2000. ®. Levy Dep. 116:10-18, Exhibit 2).

3.  Robert Levy believed that the statute of limitations was "keyed off" of plaintiff's

appointment with Dr. Peterie on October 24, 2000.  Doc. 124-3, 106:17-25, 108:18-21.

4.  Defendant testified that plaintiff did not tell him that Dr. Gilbert conveyed to him that

he had a serious and permanent infection or one that he would "take to his grave."  Doc. 124-3,

153:6.

5.  Plaintiff shared his determination of the statute of limitations with Jerry

Levy on or about October 31, 2002. (J. Levy Dep. 17:24-18:2, Exhibit 22).

6.  James McVay, attorney for the workers' compensation carrier, testified in

his deposition that he spoke to Defendant regarding whether Defendant was going to file

or had filed a third-party case against Dr. Kramer on Plaintiff's behalf. (McVay Dep.

26:13-27:20, Exhibit 32).  Robert Levy indicated this conversation took place in October 2002.

Doc. 124-3, 108:18.

7.  Not supported by the testimony cited.

8.  Mr. Bleeker's belief not shown to be relevant.

9.  Mr. Brave's belief not shown to be relevant.

10.  In the course of Jerry Levy's co-representation of Plaintiff in the

underlying case, he obtained Plaintiff's medical records. (J. Levy Dep. 32:20-33:24,

Exhibit 22).

11.  Once Jerry Levy obtained Plaintiff's medical records, he reviewed the records from St. Catherine's Hospital and reportedly formed the belief that Dr. Kramer was negligent in the performance of the surgery. (J. Levy Dep. 44:1-24, Exhibit 22).  Jerry Levy's representation of plaintiff commenced after the statute of limitations had already expired on any claim relating to Dr. Kramer's treatment of plaintiff's leg.

12.  From that point in time Jerry Levy believed there was a potential statute of limitations problem, but he "put his best face forward at all times" to down play what he perceived as a problem. (J. Levy Dep. 45:1-8, Exhibit 22).

13.  Dr. Kramer's attorneys filed a Motion for Partial Summary Judgment on July 8, 2004 in the underlying case. (Docket from underlying case, Exhibit 33).

14.  Once Dr. Kramer's attorneys filed the motion for summary judgment on the statute of limitations, Defendant wrote a letter to Plaintiff conveying that "both Jerry and I feel strongly that we should be able to defeat this motion. Jerry and I both agree that every attempt should be made to respond to this Motion prior to July 27, 2004 so the defense attorneys may have time to digest their last hope." Despite Jerry Levy's reported disagreement with this position, he did not do anything to express his disagreement with this to his client, Plaintiff. ®. Levy July 14, 2004 letter to Plaintiff, Exhibit 21; J. Levy 53:1-21, Exhibit 22).

15.  Jerry Levy also wrote a series of e-mails and letters expressing an opinion that the statute of limitations had no merit including:

a.  A July 16, 2004 letter to the mediator Bryson Mills, in which Jerry Levy expressed that October 24, 2000 was "the first time plaintiff felt that he had an injury that

may have been caused by the negligence of Kramer" and that the motion for partial summary judgment on the statute of limitations issues was, in his opinion, "lame at best." (July 16, 2004 Letter, Exhibit 34).

b. July 26, 2004 letter to Jerry Remick with the Kansas Health Care Stabilization Fund stating that the motion for summary judgment "is so weak it borders on being frivolous." (July 26, 2004 letter, Exhibit 35).

c. July 26, 2004 e-mail to Steve Brave stating, "After your SJ motion is denied, then there may be an issue of fact on SOL." (July 26, 2004 e-mail, Exhibit 36)

d. August 16, 2005 e-mail exchange with Steve Brave regarding October 24, 2000 appointment with Dr. Peterie and its basis for Plaintiff's knowledge of malpractice. (August 16, 2005 e-mails, Exhibit 37).

16. Steve Brave, one of the attorneys for Dr. Kramer, testified that he did not recall that there was any exchange of offers and demands or efforts to negotiate a settlement prior to the mediation in July 2006 in the underlying case, by which time the summary judgment motion had already been filed. (Brave Dep. 53:25-54:6, Exhibit 4).

17. Jerry Levy's strong efforts to settle the case came after the summary judgment motion had been filed, in a mediation letter of July 16, 2004, letter to the Kansas Health Care Stabilization Fund on July 26, 2004, and continuing thereafter, for example in a December 23, 2004 e-mail and January 17, 2006 letter. (J. Levy Letter July 16, 2004, Exhibit 34; J. Levy Letter July 26, 2004, Exhibit 35; J. Levy e-mail December 23, 2004, Exhibit 38; J. Levy Letter January 17, 2006, Exhibit 39).

18. Over the several days Plaintiff was in the hospital prior to his surgery, Dr. Kramer talked to him about the risks and potential complications of the surgery. (Kramer Dep. 88:6-12, Exhibit 29).

19. Plaintiff also received additional education regarding care of his fracture and surgical site, including instructions regarding proper post-operative care, proper lifestyle choices and post-procedure care relating to enhancing circulation. (St. Catherine's Education Records, Exhibit 40).

20. Plaintiff signed an informed consent form on multiple occasions through the course of treatment, acknowledging that he was instructed regarding the risks and complications of the surgery or procedure, including the initial surgery to repair the fracture calcaneous, debridement, and removal of hardware. (Informed Consent Forms, Exhibit 26).

21. When asked what he would have recommended to Mr. Berndt to reduce his risk of infection, Dr. Moore noted that generally speaking "the rule is no smoking" and "[d]on't get it wet." (Moore Dep. 46:15-25, Exhibit 41).

22. Dr. Bruner would have advised the plaintiff to quit smoking had the plaintiff had been his patient.

23. Dr. Jerry Peterie, who actually saw Plaintiff as a patient, indicated that a patient in plaintiff's situation would minimize the risk of infection if he would quit smoking. (Peterie Dep. 25:17-26:5, Exhibit 24).

24. Upon Plaintiff's discharge from the hospital, his wife would be the one changing the dressings over his wound and was instructed in how to do so. (J. Berndt Dep. 61:10-15; June 19,

2000 Medical Record, Exhibit 43).

25-27.  Not included in brief.

28.  At the time Plaintiff visited Dr. Gilbert for the evaluation on September 1, 2000, Plaintiff's wound site looked good.  Dr. Gilbert did not have any major concerns, but the nature of the injury and the treatment of it were fraught with hazards, and the plaintiff was having problems. (Gilbert Dep. June 25, 2004 pp. 20-24, 37:24-39:15, Exhibit 19).

29.  At the time Dr. Gilbert saw Plaintiff on September 1, 2000, Plaintiff's fracture was progressing toward union, the wound appeared to be benign, and he was on appropriate antibiotics. (Gilbert Report April 23, 2009, Exhibit 12).  Dr. Gilbert would defer to an infectious disease specialist insofar as management of an infection is concerned.

30.  Janice Berndt doesn't think that her husband, Plaintiff, came away from his examination with Dr. Gilbert thinking that the infection was a really bad thing or that he was really nervous about it. (J. Berndt Dep. 64:8-16, Exhibit 1).

31.  On February 12, 2001, Dr. Naomi Shields, an orthopaedic surgeon, met with Plaintiff to provide him a second opinion regarding future treatment of his foot. (February 12, 2001 Shields Medical Record, Exhibit 44; Shields April 26, 2004 Dep. 4:12-4:25, Exhibit 25).

32.  At that appointment, Dr. Shields discussed three possible treatment options with Plaintiff, including (1) continuing with the current plan of treatment and taking antibiotics as needed if the infection flared up, (2) try to salvage the foot by proceeding with debridement, antibiotics and reconstruction, or (3) undergoing below the knee amputation. (Shields April 26, 2004 Dep. 13:6-14:7, Exhibit 25).  Dr. Shields strongly recommended that he consider a below-knee amputation with a post-op prosthesis.

33. After Dr. Shields and Plaintiff discussed his options, Plaintiff was unwilling to give up cigarette smoking and did not wish to attempt the second option since it came with no guarantees, and he elected to undergo the amputation. (Shields April 26, 2004 Dep. 12:4-12, emphasis added, Exhibit 25).

34. Defendant's expert Dr. Dan Hinthorn has stated in his report that Dr. Kramer's treatment of Plaintiff's pseudomonas infection, regardless of whether or not it was deficient, was not the primary cause of Plaintiff's amputation, because there is less than a fifty-percent likelihood of success in curing pseudomonas osteomyelitis post fracture in a smoker. (Hintorn Report April 29, 2009, Exhibit 16).

35. Dr. Hinthorn believes it is quite likely that Plaintiff contracted the pseudomonas infection when the surgical site was draining and became wet. (Hinthorn Report April 29, 2009, Exhibit 16).

36. Dr. Hinthorn also opines that the nature of the severe injury and fact that Plaintiff was a smoker significantly increased the likelihood of a failed surgery, as well as post-surgical infection. (Hinthorn Report April 29, 2009, Exhibit 16.).

37. Plaintiff's expert Dr. Thomas Moore also acknowledged that heavy smokers, such as Plaintiff, have a higher instance of wound infection and difficulty healing. (Moore Dep. 45:13-46:14, Exhibit 41).

38. Defendant's expert Dr. Greg Horton has opined that Dr. Kramer did not deviate from the standard of care and that even in the best circumstances, poor outcomes are extremely likely for individuals with Plaintiff's injury. (Horton Report September 11, 2004, Exhibit 13; Horton Report April 30, 2009, Exhibit 14).

39. Defendant's expert Dr. John Gilbert has also indicated that Dr. Kramer's recommendation to perform open reduction and internal fixation of the fractured calcaneous, his treatment of the fracture blisters, timing of surgical intervention and operation in the presence of fracture blisters were within the standard of care. (Gilbert Report April 23, 2009, Exhibit 12).

40. Dr. Gilbert has also opined that Dr. Kramer's open irrigation and debridement, culture and treatment with antibiotics, as well as the absence of bone graft, and decision not to remove the hardware were also within the standard of care. (Gilbert Report April 23, 2009, Exhibit 12).

**Plaintiff's Motion for Partial Summary Judgment - Discussion**.

A. *Alleged Fault of Defendant Robert Levy*. Plaintiff contends that as a matter of law, Robert Levy was at fault for failing to file plaintiff's medical malpractice claim within the statute of limitations. This is so because "assuming the Court [grants] Plaintiff's *Daubert* motions regarding Brad Ralph and Harry Bleeker, Defendant Robert Levy will not have any expert testimony to offer on the issues of standard of care and comparative fault." Doc. 106 at 26.

As indicated above, the court grants the plaintiff's motion to exclude expert testimony from Mr. Bleeker, but denies plaintiff's motion to exclude the expert testimony of Mr. Ralph except as it pertains to Jerry Levy. In Mr. Ralph's testimony, defendant has cited some evidence from which a jury could find that he complied with the applicable standard of care, because according to Ralph it was reasonable under the circumstances to rely on the information provided by the plaintiff and the doctor's written report of the September 1, 2000 office visit. Of

course, plaintiff may present evidence that Levy should have investigated further or should have been aware from Dr. Gilbert's September 1 report that the substantial nature of the infection was made known at that time, and plaintiff may present expert testimony that a prudent lawyer would have filed a malpractice claim within two years of that date to avoid any chance that the statute of limitations would bar a claim. But such matters present questions of fact for a jury to determine. *See Hunt v. Dresie*, 241 Kan. 647, 656, 740 P.2d 1046 ("Whether or not defendants were negligent in filing the suits depends upon the totality of the circumstances as determined by the trier of facts. Because district judges and appellate court judges are, themselves, attorneys, they naturally have opinions as to whether or not certain conduct constitutes legal malpractice. It is easy to slip into the trap of deciding such questions 'as a matter of law.'"). Moreover, the court cannot agree with plaintiff's contention that any failure by plaintiff to tell Robert Levy about Dr. Gilbert's oral comments was immaterial as a matter of law. While it is true that Robert Levy had Dr. Gilbert's September 1 written report, that report did not contain the same unequivocal indications of a permanent injury as the doctor's oral comments to plaintiff. The written report indicated the infection was "tenacious," not that plaintiff would always have it and would "take it to the grave" with him. As defendant points out, the Tenth Circuit relied upon plaintiff's deposition testimony recounting Dr. Gilbert's oral statements when the court concluded that plaintiff knew of the substantial and permanent nature of the infection on September 1, 2000. A reasonable jury could find that plaintiff's alleged failure to pass this information along to Robert Levy contributed to Levy's failure to file the action within the statute of limitations. Accordingly, plaintiff's motion for summary judgment on this issue will be denied.

44

B. *Plaintiff's Alleged Comparative Fault*.  Plaintiff argues he is entitled to summary judgment on defendant's claim that he (plaintiff) was at fault, including any claim of fault relating to the instant legal malpractice suit and any fault in the underlying medical malpractice action against Dr. Kramer.

As plaintiff recognizes, the negligence of a client may be compared to the negligence of his attorney when the client's conduct "falls below the standard to which he should conform for his own protection and which is a legally contributing cause, cooperating with the negligence of the defendant, in bringing about the plaintiff's harm."  Doc. 106 at 32 (*citing Pizel v. Whalen*, 252 Kan. 384, 845 P.2d 37, 42 (1993)).  Comparative fault principles apply to a legal malpractice action unless as a matter of law the client had no obligation to act on his own behalf.  *Pizel v. Zuspann*, 247 Kan. 54, 795 P.2d 42 (1990), *modified on denial of rehearing by* 247 Kan. 699, 803 P.2d 205 (1990).  Although it is true, as plaintiff argues, that he had a right to rely on the defendant's knowledge and advice, such reliance does not completely relieve plaintiff of any obligation to exercise due care for the protection of his claim – including a duty to provide known material facts to his attorney.  While a jury might find that plaintiff could not be expected to realize the importance of his doctor's comments, and hence did not act unreasonably, such a view of the evidence is not compelled as a matter of law.  It is also true, as plaintiff suggests, that a jury could find that plaintiff actually provided all of the material facts to Levy (including the "to the grave" characterization of the infection), or that any failure to do so was immaterial in view of Robert Levy's duty of care and the other evidence available to Levy.  But a jury would not have to accept such a view of the evidence.  Because a reasonable jury viewing the evidence in a light most favorable to the defendant could conclude that plaintiff breached a duty of care by

failing to provide known material facts about the infection to Robert Levy, and that the failure contributed to the late filing of his lawsuit, plaintiff's motion for summary judgment on the issue of plaintiff's comparative fault relating to the statute of limitations will be denied.

As for the underlying medical malpractice claim against Dr. Kramer, defendant lists the following to support his contention that plaintiff's fault should be compared with that of Dr. Kramer: plaintiff's alleged failure to demand clean sheets at St. Catherine's hospital; plaintiff going on vacation shortly after his release from the hospital; plaintiff's continued smoking after his injury; plaintiff's election to continue receiving treatment from Dr. Kramer; and plaintiff's decision to undergo amputation. As plaintiff points out, however, defendant cites no expert medical testimony that any of the foregoing actually caused or contributed to plaintiff's infection. Defendant's contention that dirty sheets in the hospital "could have certainly been the source of the infection" amounts to nothing more than speculation, with no medical assessment of the probability that any such occurrence (assuming it occurred) impacted his infection. Similarly, there is no medical evidence that plaintiff's choosing to go on vacation – apparently with his doctor's approval – played any causative role. Defendant has cited some evidence that Dr. Shields likely advised plaintiff to quit smoking, and he also cites medical testimony that decreased circulation in the extremities of people who smoke places them at greater risk of infection from surgery and inhibits healing. But nowhere does defendant cite any expert medical testimony that assesses the probability that plaintiff's failure to quit smoking after being advised to do so actually played any role in his infection. As plaintiff points out, it was on or about February 21, 2000, when Dr. Shields allegedly talked to plaintiff about his smoking, and defendant cites no medical evidence assessing the probabilities that plaintiff's failure to quit

smoking at that point contributed to the infection.  A vague assertion that plaintiff's smoking "made him more susceptible" to infection is not sufficient.  *Cf. Nunez v. Wilson*, 211 Kan. 443, 445-46, 507 P.2d 329 (1973) (no particular words of art are required if medical expert's testimony reflects professional opinion as to reasonable medical probabilities).  Defendant has thus failed to cite evidence showing a genuine issue of fact as to whether plaintiff's continued smoking was an unreasonable act that caused or contributed to his damages.  *Puckett v. Mt. Carmel Regional Med. Center*, 228 P.3d 1048 (2010) (quoting Prosser and Keeton, The Law of Torts § 41, p. 269 (5th ed.1984) ("if causation 'is not one within common knowledge, expert testimony may provide a sufficient basis for it, but in the absence of such testimony it may not be drawn.'").  Finally, defendant fails to show how plaintiff's choice to seek continued treatment from Dr. Kramer for his ankle or his decision to follow Dr. Shields' recommendation for surgical amputation could, in themselves, be considered negligent acts.  Summary judgment will thus be granted in plaintiff's favor on any claim seeking to assert plaintiff's fault for his physical injuries.

C. <u>*Alleged Comparative Fault of Mrs. Berndt and/or St. Catherine Hospital*</u>.  The court rejects defendant's claim that a jury should be allowed to assess fault against Janice Berndt for plaintiff's injuries.  This contention appears to be based on two items:  (1) Dr. Hinthorn's opinion that plaintiff likely contracted his infection when the surgical site became wet, rather than through the surgery, and (2) defendant's pure speculation that this "would likely have happened while Plaintiff's wife Ms. Berndt was caring for and changing the dry dressings on his foot."  Assuming Dr. Hinthorn's medical opinion is properly introduced at trial, defendant may argue that the infection was caused by something other than Dr. Kramer's negligence, but there

is no evidence that Mrs. Berndt failed to follow any instructions she was given relating to changing bandages, and it would be sheer speculation to infer that some failure on her part led to the infection. Similarly, defendant's claim of comparative fault on the part of St. Catherine's hospital is unsupported by any medical testimony opining that the hospital's actions fell below the applicable standard of care or that there was a causal relationship between some negligent act by the hospital and plaintiff's infection. Plaintiff's motion for partial summary judgment on these issues will be granted.

D. *Alleged Fault of Dr. Kramer*. Lastly, plaintiff contends that had Robert Levy filed the action within the statute of limitations, Dr. Kramer would have admitted that he departed from the standard of care in his treatment of plaintiff. As such, plaintiff contends he is entitled to partial summary judgment finding that Dr. Kramer departed from the standard of care.

As defendant points out, plaintiff's sole support for claiming that Dr. Kramer would have admitted a departure from the standard of care is the deposition testimony of Mr. Brave, who second-chaired the defense for Dr. Kramer. Mr. Brave testified that if the medical malpractice case had gone to trial, he would have recommended admitting a departure from the standard of care and defending the case on the issue of causation. His testimony indicates that his co-counsel, who was a partner with the firm, would have had the final say on what actual recommendation to make to the client. Doc. 124-5 at p. 85. Clearly, such a hypothetical recommendation of admitting fault does not constitute an admission by the client and does not constitute uncontroverted proof of fault on Dr. Kramer's part. Plaintiff's motion for partial summary judgment on this issue is denied.

**IV.** ***Defendant's Motion for Partial Summary Judgment***. (Doc. 82).

Defendant Robert Levy moves for partial summary judgment on two issues. First, defendant asserts that Dr. Kramer had total insurance coverage in the amount of $800,000 on plaintiff's malpractice claim and contends plaintiff has no evidence that Dr. Kramer would have been able to satisfy any judgment over that amount. Accordingly, defendant "seeks a ruling from the Court as a matter of law that Plaintiff's damages in the instant case be limited to a total of $800,000." Doc. 83 at 7. Second, defendant notes that plaintiff's employer and its workers' compensation insurance carrier intervened in the medical malpractice action to protect a lien for benefits allegedly paid in the amount of $258,633.43 (including $174,831.99 in medical benefits), plus an open amount to be paid for additional future medical benefits. Defendant argues that "Plaintiff would not have been entitled to retain the portion of the damages award subject to the subrogation interest, because the interveners would have asserted their lien rights in such a recovery." As such, defendant contends the proper measure of damages in this action is the total hypothetical damages recoverable in the medical malpractice action less the amount of the workers' compensation subrogation interest. Defendant cites cases from other jurisdictions applying such a rule.

Plaintiff, in opposition, argues at length that there is no requirement under Kansas law that a plaintiff in a legal malpractice action show that the prior action would have resulted in a *collectible* judgment in his favor. Doc. 6 at 17-21. Even if there is, plaintiff argues, there is adequate evidence that Dr. Kramer could have satisfied any judgment up to the amount claimed in the prior case (total damages of approximately $2.4 million). As for any workers' compensation benefits or liens, plaintiff argues such benefits are a "collateral source" under

Kansas law and are not admissible in the medical malpractice action or this action. Moreover, plaintiff contends any workers' compensation lien is now unenforceable because the statute of limitations expired when the subrogation lien was previously asserted. As for the prospect of "double recovery," plaintiff says Kansas law provides that "double recovery by a Plaintiff is acceptable so long as the source of such payment is unconnected to the tortfeasor," and "the fact that a workman has received compensation from his employer for the same injury constitutes no defense, or partial defense, to a negligent third party in an action against the third party by the workman for damages." Doc. 96 at 28 (citations omitted).

*Additional Uncontroverted Facts*.

1. On or about March 11, 2002, Plaintiff retained Defendant to represent him in, among other things, a workers compensation case arising out of the June 9, 2000 injury.

2. In conjunction with that case, Plaintiff received workers compensation benefits for lost wages and medical expenses from Employers Mutual Insurance Company and Stanton County, Kansas, which covered Plaintiff's medical care for all injuries arising out of the June 9, 2000 injury, including the amputation and prosthetic device.

3. The workers' compensation case was eventually settled, but the award for medical expenses was left "open" so that Plaintiff could continue to receive medical care through the workers compensation carrier for his injuries.

4. Defendant also represented Plaintiff in a medical malpractice case against Dr. Gary Kramer, and filed a cause of action on Plaintiff's behalf in said case.

50

5.  Employers Mutual Insurance Company and Stanton County, Kansas intervened in the medical malpractice suit in order to protect their subrogation interests in the case.  No determination was made in that case as to whether the lien was valid and enforceable because the action was subsequently dismissed.

6.  Employers Mutual Insurance Company and Stanton County, Kansas claimed a subrogation interest and lien in the amount of $258,633.43 (with $174,831.99 in medical benefits), as well as any non-duplicative amounts and additional benefits to be paid by them in the future.

7.  In the instant case, Plaintiff seeks damages that he alleges he would have recovered in the medical malpractice action had it been timely filed and permitted to proceed to a final result, as well as consequential damages as a result of having to file the instant action.

8.  Among other damages, Plaintiff seeks damages for past and future lost wages, and medical expenses.

9.  Plaintiff cites some evidence that after Dr. Kramer relocated to Oklahoma, he was covered by a PLICO insurance policy in effect from 2002 to 2005, with coverage in varying amounts.  Plaintiff cites no evidence, however, to show that this policy applies to Kramer's treatment of the plaintiff.

10.  Plaintiff has cited some circumstantial evidence of Dr. Kramer's income during the relevant period, including his prior deposition testimony discussing his practice and his Curriculum Vitae stating that as of 2001, he handled 5,000 patient encounters and 500-700 surgical cases per year.

*Discussion*.

The following elements are necessary to prove legal malpractice under Kansas law: (1) the existence of an attorney-client relationship giving rise to a duty; (2) the attorney's breach of that duty by act or omission; (3) the breach proximately caused injury to the client; and (4) the client sustained actual damages. *Phillips v. Carson*, 240 Kan. 462, 476, 731 P.2d 820 (1987). When the plaintiff claims litigation was mishandled by his attorney, the plaintiff "must establish the validity of the underlying claim by showing that it would have resulted in a favorable judgment in the underlying lawsuit had it not been for the attorney's error." *Canaan v. Bartee*, 276 Kan. 116, 72 P.3d 911, 914-15 (2003).

Kansas courts have apparently not expressly decided whether the "favorable judgment" must have been collectible in order to recover against the attorney, although courts have suggested in dicta that such is the case. *Cf. Webb v. Pomeroy*, 8 Kan.App.2d 246, 249 655 P.2d 465 (1982) (citing Meiselman, Attorney Malpractice: Law and Procedure § 3:5 at 44 (1980)). *See also Ellibee v. Hazlett*, 2006 WL 3050801 (D. Kan. 2006); *Augustine v. Adams*, 1997 WL 298451, *4 (D. Kan. 1997). The requirement of "actual damages" suggests the plaintiff may not recover damages against the attorney if plaintiff would have been unable to collect on the underlying judgment. The general rule in other states appears to be in accord with this view. *See e.g., Black v. Shultz*, 530 F.3d 702, 709 (8th Cir. 2008) (applying Nebraska law; plaintiff must show not only the amount of the judgment she would have obtained, but also the amount she would have collected). See also Am. Jur. (Second), Attorneys §223 ("a plaintiff's burden in a suit-within-a-suit legal malpractice action is to prove by a preponderance of the evidence that but for the malpractice or other misconduct, (1) he or she would have recovered a judgment in

the action against the main defendant, (2) the amount of that judgment, and (3) the degree of collectibility of such judgment."). This view is also in keeping with the purpose of compensatory damages, which are designed to place the plaintiff in a position substantially equivalent to that which he would have occupied had the tort not been committed. *Restatement (Second) of Torts*, §903. As such, the court concludes that Kansas courts likely would preclude a plaintiff from recovering damages for the loss of a judgment where the evidence in the case shows the judgment would have been uncollectible. *Cf.* Restatement (Third) of The Law Governing Lawyers § 53, comment. b (2010) ("the lawyer's misconduct will not be the legal cause of loss to the extent that the defendant lawyer can show that the judgment or settlement would have been uncollectible, for example because the previous defendant was insolvent and uninsured."). The court notes that under the Restatement view, supra, the burden is on the defendant attorney to show that the judgment – which he initially thought worth pursuing – would have been uncollectible. The court agrees that it is appropriate in these circumstances to place the burden of proof on the defendant. At any rate, this conclusion does not entitle the defendant to a partial summary judgment, because even if Dr. Kramer's insurance coverage was limited to $800,000, as defendant argues, plaintiff has cited circumstantial evidence that Dr. Kramer's continued generation of income after this episode provided a source from which a judgment creditor likely could have collected additional funds, although the precise amount is unclear on the current record. The collectibility of a judgment against Dr. Kramer thus presents an issue of fact for a jury.

As for the claimed workers' compensation lien in the underlying case, again neither party cites any controlling Kansas case law on that issue. Although plaintiff cites various Kansas

cases on the inadmissibility of collateral source payments, the cases cited deal with the underlying tort litigation for physical injuries, not with damages for legal malpractice arising from the mishandling of the personal injury litigation.  There is apparently no Kansas authority on the latter question, and a split of authority from other jurisdictions on the issue.

One line of authority finds that collateral source payments received by the client have to be deducted in the legal malpractice action to properly determine the damages caused by the attorney.  In *Moores v. Greenberg*, 834 F.2d 1105 (1st Cir. 1987), for example, the court held that a damage award against an attorney for negligently failing to obtain a settlement had to be reduced by the amount of a workers' compensation lien that would have applied to the settlement.  The court reasoned that the damages caused by the attorney's actions did not include the lien amount because that sum "would have been diverted to the carrier" out of the settlement. *Id*. at 1114.  In *Nguyen v. Cascade Law Group, P.L.L.C.*, 154 Wash.App. 1013, 2010 WL 165094 (2010), the court affirmed the trial judge's reduction of damages against the defendant attorney by an amount the plaintiff obtained in settlement from the defendant in the underlying litigation.  The court said the collateral source rule had no application because the settlement amount received by the plaintiff compensated him for a different injury (i.e., damages from breach of contract on a house purchase) than the injury caused by the lawyer's negligence (damage to the value of plaintiff's legal claim). *Id*. at *3.  *See also Sterling Radio Stations, Inc. v. Weinstine*, 328 Ill.App.3d 58, 765 N.E.2d 56 Ill.App. 1 Dist. (2002) (finding collateral source rule does not apply:  "The injuries resulting from legal malpractice are not personal injuries, but are pecuniary injuries to intangible property interests. The legal malpractice action places the plaintiff in the same position he or she would have occupied but for the attorney's negligence.

The operative words are 'in the same position.' The plaintiff can be in no better position by bringing suit against the attorney than if the underlying action had been successfully prosecuted or defended.") [citations omitted].

The other line of authority holds that collateral source payments should not be reduced from the amount of damages recoverable by the plaintiff in a legal malpractice action. *Norton v. Superior Court*, 24 Cal.App.4th 1750, 30 Cal.Rptr.2d 217 Cal.App. 2 Dist. (1994) ("due to the unique nature of a legal malpractice action, being the trial of a 'suit within a suit,' the defendant attorney stands in the shoes of the underlying tortfeasor insofar as the collateral source rule is concerned. Thus, the collateral source rule applies indirectly in a way which makes evidence of payments from a collateral source irrelevant on the question of damages."); *Guidry v. Coregis Ins. Co.*, 896 So.2d 164, La.App. 3 Cir. (2004) ("The Defendants argue that the collateral source rule does not apply in the instant case because they are not the tortfeasors in the underlying suit. Nonetheless, Lucky and Sponco, the two liable parties in the underlying suit, could not have benefitted from the workers' compensation carrier's payments. Accordingly, the Defendants cannot claim the benefit either.").

A leading treatise in this area endorses the first line of authority, which holds that the plaintiff should be fully compensated for the injury caused by the attorney but should not receive a windfall or double recovery because of collateral source payments:

> In a legal malpractice action, the objective is to determine what sum the client should have recovered had the lawyer not erred. An analytical problem arises where the collateral source rule means that a payment to the client for the injury in the underlying action would not have been credited to the tortfeasor in that action. If a recovery in the underlying action would not have been reduced because of the collateral source rule's application in that action, then arguably the attorney's liability should not be reduced.[] The

> attorney, however, only theoretically "stands in the shoes" of the defendant in the underlying action, and is not a joint tortfeasor. Thus, the party benefiting from the collateral source rule usually does not have a lien or subrogation entitlement to the legal malpractice recovery. In such situations, the client would be unjustly enriched. Since the objective is to assure that the client is fully compensated, the recovery should be reduced by the sum the client has received already. The result deviates from a strict case-within-a-case methodology, which is appropriate when sound policy requires it.

R. Mallen & J. Smith, Legal Malpractice §21.20 (Dec. 2009).

The question before the court is fundamentally one of causation – i.e., what injury was caused by the attorney's alleged negligence?  Although there is no clear answer under Kansas law, the court believes Kansas courts would likely invoke the general principle that a  plaintiff is entitled to such damages as will put him in the same position he would have been in had the (attorney's) tort not been committed.  *See Restatement (Second) of the Law of Torts*, § 901, General Principles, comment a. ("the law of torts attempts primarily to put an injured person in a position as nearly as possible equivalent to his position prior to the tort.").  Under that view, a plaintiff should not be able to recover damages for expenses that are covered by a workers' compensation lien if the lien would have reduced the plaintiff's actual recovery in the underlying tort action.  But the determination of the validity of a lien and its application to reduce otherwise recoverable damages are matters of law for the court, not a factual issue for a jury to determine. Accordingly, if the jury finds in plaintiff's favor, it will determine the amount of damages plaintiff would have recovered in the underlying action against Dr. Kramer without reduction for any lien.  The court will thereafter determine as a matter of law whether any such award is subject to reduction for a workers' compensation lien.

**V.** ***Motion to Bifurcate*** (Doc. 76).

Defendant argues that because of the "trial-within-a-trial" aspect of the case, the trial of the legal malpractice and medical malpractice issues should be bifurcated and tried separately, with the medical malpractice issues tried first. Plaintiff opposes the motion, arguing that bifurcation will not advance the interest of economy and efficiency and will cause unnecessary delay.

Under Fed.R.Civ.P. 42(b), the court may order separate trials of any claim or issue in order to avoid prejudice, for purpose of convenience, or to expedite or economize. In this instance, the court concludes there is a significant potential for jury confusion if all issues are thrown at the jury simultaneously. However, completely separate trials with separate jury panels would be a waste of resources and cause undue delay. The danger of confusion can be avoided, in the court's view, by altering the order of proof so that the issues are presented to the jury in two phases. The court believes the medical malpractice issues involving Dr. Kramer should be presented to the jury first, with the jury returning a partial verdict on fault and damage issues on the underlying medical malpractice claim. The legal malpractice issues could then be presented to the jury, if necessary, with the jury determining the comparative fault of the parties on that claim.

**VI**. ***Conclusion***.

Plaintiff's Motion to Exclude Testimony by Brad Ralph (Doc. 101) is GRANTED in PART and DENIED IN PART. The motion is GRANTED with respect to opinions about the conduct of Jerry Levy, but is otherwise DENIED.

Plaintiff's Motion to Exclude Testimony by Harry Bleeker (Doc. 103) is GRANTED.

Plaintiff's Motion to Exclude Testimony by Ed Gormanson (Doc. 122) is GRANTED.

Plaintiff's Motion to Exclude Testimony by Bud Langston (Doc. 123) is DENIED.

Plaintiff's Motion for Summary Judgment (Doc. 105) is GRANTED IN PART and DENIED IN PART.  The legal malpractice claim against defendant Robert Levy presents a genuine issue of fact for a jury.  Defendant may seek to compare plaintiff's fault on that claim. The claim of medical malpractice against Dr. Kramer presents a genuine issue of fact for a jury. Defendant may not assert or compare fault on the part of Mrs. Berndt, St. Catherine's Hospital, or the plaintiff with respect to the claim of medical malpractice against Dr. Kramer.

Defendant's Motion for Partial Summary Judgment (Doc. 82) is DENIED.  The collectibility of any judgment against Dr. Kramer presents an issue of fact for a jury. Additionally, the court will determine if any reduction in damages is required by law for a workers' compensation lien.

Defendant's Motion to Bifurcate (Doc. 76) is GRANTED IN PART to the extent that the court will conduct the trial in two phases, with the jury first determining the medical malpractice issues and then, if necessary, the legal malpractice issues.

Defendant's Motion for Extension of Time (Doc. 110) is DENIED; Defendant's Motion for Leave to File Surreply (Doc. 127) is GRANTED.

IT IS SO ORDERED this  30th   Day of September, 2010, at Wichita, Ks.


s/Wesley E. Brown
Wesley E. Brown
U.S. Senior District Judge